Harvey Brown, Justice
Monica Townsend and Erik Vasquez are the parents of a child, C.V. After their 2012 divorce, a court entered an agreed order that the parents would be C.V.'s joint managing conservators and that Monica would have the exclusive right to determine C.V.'s domicile.
Erik initiated this suit and sought to modify the conservatorship order to grant him the exclusive right to determine C.V.'s domicile. After a bench trial, the trial court granted Erik's requested modification. In four issues, Monica challenges the trial court's actions. We affirm.
Background
Erik and Monica divorced in 2012, and the court entered an agreed custody order providing that C.V.-then almost six years old-would live with Monica and that Erik would exercise standard visitation rights. The order also named both parents as joint managing conservators. It gave Monica the exclusive rights to determine C.V.'s domicile and to direct C.V.'s education and gave both parents the shared right to jointly direct C.V.'s medical and psychiatric care. Monica and either Erik or his relatives would meet at a designated place to transfer C.V. for visitation.
Things changed around 2015, when, according to trial testimony, Monica began refusing to transfer C.V. at the designated place unless a police officer was present. Erik then initiated this suit to change the visitation-transfer location to a local police department, in accordance with Monica's wish to have a police officer present. Monica counter-petitioned to have Erik's future visitation periods supervised and to be named as sole managing conservator. Erik later amended his petition to seek the exclusive right to determine C.V.'s domicile. Both parents alleged that a material and substantial change in their and C.V.'s circumstances supported a modification. See TEX. FAM. CODE § 156.101(a)(1)(A).
By Rule 11 agreement, which was later entered as the court's temporary order, Erik and Monica agreed to the appointment of a licensed psychologist, Dr. Marie Alvarez, to evaluate C.V. and the living situation at each parent's home.
The parties tried the case without a jury. Though the suit was pending before the 300th District Court of Brazoria County, Hon. Randall Hufstetler presiding, the elected judge of the Brazoria County County Court at Law No. 3, Hon. Jeremy Warren, presided over the trial.
At trial, Erik called several witnesses in support of his requested modification. He testified first, explaining that he has remarried and has lived with his new wife and her biological sons for about two years. His parents live in a different home on the same property. His parents help care for C.V. during visitation periods, and C.V. gets along with the other children. Erik's wife takes C.V. to school from time to time too, and the family takes trips and goes fishing together.
Erik testified that until recently his visitation with C.V. generally went well. He helps C.V. with his homework, and he tries to learn about C.V.'s grades. He eats lunch with C.V. at school on occasion. And he enjoys fishing with C.V., watching C.V. play basketball at the YMCA, and going to the movies with C.V.
*801 Erik testified that Monica's and her mother's conduct in 2015 and 2016 changed things. According to Erik, he stopped the school lunch visits because Monica's mother would also show up and chill C.V.'s interaction with him. Monica requested that Erik undergo drug and alcohol testing, and all tests were negative. Though the most recent summer visitation went well, CPS investigated Erik anyway, apparently at Monica's request. He also testified that Monica has been trying to turn C.V. against him-trying to "brainwash" him-and he feared that her efforts would continue absent a custody modification.
Erik admitted, though, that there had been limits to his past involvement. He had not attended any meetings with school personnel to address C.V.'s academic performance[2] or any of C.V.'s appointments with medical and psychiatric caregivers. He does not know whether C.V. needs to take any medication, though he has noted that no medication comes with C.V. during scheduled visitations, and C.V. has only taken Tylenol during his visits. Erik has not read C.V.'s school or therapy records, though he could have. He also admitted his 2005 and 2006 convictions for family violence against Monica. Finally, he admitted that Monica is not a bad mother, she would never intentionally harm C.V., and his only concern about C.V. continuing to live with Monica is her attempt to undermine Erik's relationship with C.V.
Erik's mother, Pauline Moeller, also testified. She picks up C.V. frequently at the visitation exchanges, and C.V. often stays with her on Friday evenings while Erik is still working, before spending the rest of the weekend with Erik and his family. According to Pauline, no medication is sent with C.V. for his visitations. Pauline takes C.V. out to eat, goes to movies with him, and lets him ride a four-wheeler on their property. C.V. seems happy spending time with both her and Erik. C.V. now gets along with Erik's wife's children, though Pauline acknowledged some early tension.
According to Pauline, C.V. once told her of an incident when he saw his mother strip naked while drinking alcohol and smoking. Pauline also described how Erik used to drink alcohol in front of C.V. and how C.V. told her that people drinking in front of him scared him.
Dr. Alvarez, a licensed psychologist, testified that she performed a psychological and custody evaluation of C.V. and his extended families. She conducted several lengthy interviews with C.V., Monica, and Erik, sometimes including C.V. in meetings with one or the other parent.
Dr. Alvarez noted what she called "a lot of inconsistencies in [Monica's] recollection and facts and data that she offers depending on who she is talking to." Monica accused Erik of "being a violent and aggressive individual," and while there were two convictions for family violence in 2005 and 2006, Monica's post-divorce accusations appeared to Dr. Alvarez to be riddled with inconsistencies. Many of Monica's responses were untruthful or, in Dr. Alvarez's professional opinion, intended to deny or mask "problems, pathology, and personality difficulties." Monica's accounts of events often shifted. Dr. Alvarez also thought that Monica underreported personality factors and associated pathology. Dr. Alvarez concluded that Monica likely "has a lot of self-esteem and a lot of low confidence issues" and suffers from some psychopathologies, including frequent untruthfulness; agenda-driven interactions with others; "under-report[ing of] the common faults that the vast majority of the *802 adult population readily admits having"; moderate anxiety; somatization; possible depression; "attention-seeking and dramatic" behaviors; and narcissism. In contrast, according to Dr. Alvarez, Erik "does not have any significant psychological disorders." He demonstrated low levels of "some personality traits of narcissism" and "some personality traits of some obsessive compulsive behaviors," but "nothing reached clinical level," which "was confirmed by all of the evaluation results."
Dr. Alvarez stated that she had confidence in Erik's truthfulness and found that he had no significant psychological disorders, with parenting scores within the normal range. Erik had expressed concern to her over Monica's alcohol and substance abuse and Monica's attempts to sabotage his relationship with C.V. Dr. Alvarez corroborated Erik's concern, concluding that many of C.V.'s statements about his father's "drinking or being mean" or alleged abuse "came directly from" Monica. In Dr. Alvarez's view, Monica was attempting "to influence or alienate [C.V.] from his father by talking to him in ways that will affect" the parent-child relationship. Specifically, Dr. Alvarez opined that Monica's push to have a police officer present at visitation exchanges "is a form of parental alienation." According to Dr. Alvarez, children need healthy relationships with both their parents and alienation attempts can qualify as abuse.
Dr. Alvarez noted positives about C.V.'s home life with Erik. Erik's mother and her husband are involved in C.V.'s life. C.V. behaves better when with his father. C.V.'s relationship with his father has improved over time, and C.V.'s emotional connections to his father and his mother are now equal.
Dr. Alvarez recommended to the court that Erik be given the exclusive right to determine C.V.'s domicile and to direct C.V.'s medical and psychological care, with joint managing conservatorship and standard possession for Monica. The amicus attorney for C.V. joined Dr. Alvarez's recommendations.
Erik's wife, Shannon Vasquez, and his stepfather, Thomas Moeller, also testified in support of Erik's position, noting how happy C.V. is with Erik and his family and how Erik's family has maintained their relationship with C.V. Shannon indicated her willingness to co-parent C.V. with Monica and to participate in counseling to that end.
Monica testified too. She sees many problems with Erik's parenting and visitation periods. For a time, C.V. returned from visitation periods anxious, sad, angry, or aggressive and, according to Monica, even had panic attacks. Monica also expressed concern that C.V. once was bitten by a dog when playing outside near Erik's stepfather's property, but no one notified her or sent her medical records of C.V.'s treatment.
Monica testified that she has taken care of virtually all C.V.'s school, medical, and psychiatric needs over the years. She has helped C.V. as he has improved his school grades and attendance, participating in many meetings with C.V.'s school counselors while Erik has not. C.V. has received therapy also because he saw Erik physically assault Monica in the past. Monica also takes C.V. to a therapist for PTSD, anxiety, ADHD, skill-building, and learning difficulties. Monica explained that C.V. will lose access to these services if he moves from Fort Bend County, where she lives, to Brazoria County, where Erik lives. Monica testified that she has completed three parenting classes in connection with this suit and has used what she learned in parenting C.V.
*803 Monica explained that she began requiring a police presence at visitation transfers because some of Erik's family would be "aggressive" toward her at the exchange or at her job. And though she requested that Erik be tested for drugs and alcohol during his visitation periods, Monica acknowledged that the tests were negative and that she is no longer concerned about C.V.'s safety with Erik. Notwithstanding C.V.'s past concerns about Erik's wife and the other children, C.V. more recently has expressed contentment to Monica about staying with his father. Monica admitted that C.V. loves and gets along well with Erik and his family. She also admitted to surreptitiously recording C.V.'s phone calls with his father.
Monica's mother also testified, and she acknowledged that C.V. loves Erik, that C.V. increasingly looks forward to seeing Erik, and that C.V. comes back to Monica a happy child after visits with Erik.
At the end of the trial, Judge Warren orally pronounced "the Court's ruling" in open court. He granted Erik's first amended petition and his requested modification, allowing Erik to determine C.V.'s primary residence within Brazoria County or contiguous counties but granted no other exclusive rights because he wanted Monica and Erik "to get along and work with [C.V.] for his best interest." He appointed both Monica and Erik as joint managing conservators. He granted Monica a standard possession order or the alternative times, if elected, under Family Code section 153.317. He terminated Erik's child-support-payment obligation and ordered Monica to pay $230 per month in child support and $61 per month in medical reimbursement, as recommended by counsel for the Attorney General. He ordered visitation pick-ups and drop-offs during the school year to take place at the school and other pick-ups and drop-offs to take place at a gas station that is equidistant from Monica's and Erik's homes. He ordered Monica to pay attorney's fees and the amicus attorney's fees. And he found that all these orders were in C.V.'s best interest.
He then asked the parties whether he had forgotten anything. Monica's counsel responded, "No, your Honor," and the other attorneys present answered similarly. Judge Warren concluded by describing his rulings as "an order that I have rendered today, and it is effective now, 2:05 p.m., February 8th, 2017," and setting an entry date for the judgment, telling Erik's counsel to "give it to me whenever you can give it to me to sign, but it's effective today."
A minute entry was made on the docket for February 8, 2017, stating:
Continue trial.... All counsel and parties present. Further evidence presented. Ruling: parents JMC, father with right to designate residence in Brazoria or contiguous counties, mother gets SPO, pay CS $230 month begin 03/01/17, pay $61 medical support; all rights and duties under the Family Code; standard mutual injunctions. Father's CS obligation terminates 02/28/17. Mother ordered to pay $15,173.78 in atty fees and $1,387 to Amicus. Entry set 03/10/17. JW
On March 13, 2017, the final order adjudicating Monica's and Erik's competing claims was entered and was signed by Judge Hufstetler. The substance of the order conformed to Judge Warren's in-court pronouncements.
On appeal, Monica challenges the modifications awarding Erik the exclusive right to determine C.V.'s primary residence and granting her only standard possession.
Jurisdiction Relating to Sharing of Judicial Duties in Same District Court
Appellate courts have an obligation to consider their jurisdiction even if not *804 raised by the parties. Malone v. PLH Grp. , No. 01-17-00618-CV, 570 S.W.3d 292, 294-95, 2018 WL 5796742, at *1 (Tex. App.-Houston [1st Dist.] Nov. 6, 2018, no pet. h.) (op.). This court issued its opinion in Malone after we issued the initial opinion in this appeal. Malone concerned appellate jurisdiction when "the parties engaged in a non-jury trial, one trial judge heard all the contested evidence, and another judge signed the final judgment." Id. Neither party in this appeal had raised a jurisdictional challenge based on Judge Hufstetler's signing the final order despite not hearing the trial evidence, so we asked the parties to file supplemental briefs on the issue. Supplemental briefing is now completed, and we conclude that we have jurisdiction to decide the merits of this appeal.
"The rules of practice and procedure in civil district court allow judges to exchange courts and transfer cases from one court to another." Id. (quoting Masa Custom Homes, LLC v. Shahin , 547 S.W.3d 332, 335 (Tex. App.-Dallas 2018, no pet.) ). They also permit one judge to hear part of a case and another judge to complete the case. Id. (citing Masa Custom Homes , 547 S.W.3d at 335 ).
A narrow exception exists when one judge presides over the entire bench trial and another judge, who heard no evidence, renders the final judgment in a case based on disputed facts. See id. at 295, at *2 ; Masa Custom Homes , 547 S.W.3d at 335-36 ; W.C. Banks, Inc. v. Team, Inc. , 783 S.W.2d 783, 785-86 (Tex. App.-Houston [1st Dist.] 1990, no writ). In such an instance, the judgment rendered by the judge who heard no evidence is void, and an appellate court asked to review that judgment is without jurisdiction to decide the merits of the appeal. See Malone , 570 S.W.3d at 296, 2018 WL 5796742, at *2 ; Masa Custom Homes , 547 S.W.3d at 338.
A rendition of judgment "occurs when the judge's decision is officially announced, either orally in open court or by signed memorandum filed with the clerk." W.C. Banks , 783 S.W.2d at 785. "After the court has rendered judgment, the subsequent reduction of the rendered judgment to a writing signed by the court is a purely ministerial act" and does not result in a void judgment that would deprive the appellate court of jurisdiction. Id.
Our jurisdiction thus turns on whether Judge Warren's statements in open court at the end of trial were a rendition of judgment. If they were not, then only the later-written final modification order, signed by Judge Hufstetler, was the final judgment in the case, and that judgment would be void because Judge Hufstetler did not hear any of the trial evidence and because the order resolved disputed facts.
We conclude that Judge Warren's statements in open court at the end of trial were a rendition of judgment, allowing us to exercise jurisdiction to determine the merits of this appeal. The reasoning of W.C. Banks is instructive. In W.C. Banks , Team sued Banks on a note, and, before trial, the court granted an interlocutory judgment against Banks on liability only. 783 S.W.2d at 784. The case proceeded to a bench trial before Judge Martinez, a visiting judge, who took the case under advisement without rendering judgment. Id. Later, an unsigned docket entry was made, stating, "Judgment for Plaintiff rendered this day. Orders to follow." Id. Still later, the incumbent presiding judge of the court in which the case was pending, Judge Cochran, signed a final judgment in Team's favor. Id.
*805 Banks challenged the judgment on appeal, contending that Judge Martinez never rendered judgment in the case, despite being the only judge to hear any of the trial evidence; the unsigned docket entry was insufficient to serve as a rendition of judgment; and the later-signed final judgment was therefore the only rendition of judgment in the case. Id. at 784-85. Because Judge Cochran had not heard any of the trial evidence, Banks argued that the signed final judgment was void. Id.
This court agreed with Banks. The parties did not dispute that Judge Martinez had not announced a judgment in open court and that no memorandum of any judgment by Judge Martinez had been filed with the clerk. Id. at 785. The court also reasoned that the unsigned docket entry was not a rendition of judgment because there was no "evidence that the unsigned docket entry was made by Judge Martinez or at his direction" and because the docket entry did not resolve the issues of damages and attorney's fees that remained in the case after the interlocutory judgment on liability. Id. Therefore, the docket entry did not "declare the court's decision on any, much less all, of the matters that remained at issue after the interlocutory judgment was rendered." Id.
Judge Warren's statements in open court were a rendition of judgment. He granted Erik's amended petition and awarded him the custody modifications that he sought. This impliedly denied Monica's requested modifications, which were mutually exclusive of what Erik sought. Judge Warren's statements also addressed all the matters that remained at issue in the case. See ids="10014244" index="23" url="https://cite.case.law/sw2d/783/783/#p785">id. Judge Warren said that he was announcing "the Court's ruling"; the record refers to his statements as the "Judge's Rendition"; and, when he asked the parties whether he had forgotten anything, all the parties, including Monica through her counsel, answered that he had not. In the docket minute entry describing the rendition of judgment, the initials "JW," presumably referring to Judge Jeremy Warren, were included, distinguishing this case from W.C. Banks . On this record, we conclude that Judge Warren orally rendered judgment and that that judgment was memorialized in writing as a ministerial act by Judge Hufstetler, allowing us to exercise jurisdiction to determine the merits of the appeal. See ids="10014244" index="24" url="https://cite.case.law/sw2d/783/783/#p785">id.
Objection to Referral to Associate Judge
The trial on the merits of a Family Code section 156.101 modification proceeding may be referred to an associate judge unless a party objects to the referral in writing. See TEX. FAM. CODE § 201.005(b). In her first issue, Monica contends that her written, pre-trial objection to an associate judge precluded the judge of the Brazoria County County Court at Law No. 3 from presiding over the trial on the merits. Monica's contention turns on whether the judge of the County Court at Law No. 3 is an "associate judge," a term that is undefined in the Family Code.
Section 201.001 of the Family Code governs the appointment of associate judges. Generally, an associate judge is appointed by the district or county court judges whom the associate judge will assist. See id. § 201.001(a) - (e) (providing circumstances under which associate judge may be appointed); id. § 201.007(a)-(e) (providing powers that associate judge exercises, for example, conducting hearings and hearing evidence). Associate judges are compensated as determined by the county commissioners' court (or courts) from the county (or counties) whose judges the associate judge serves. See id. § 201.003(a)-(d). Associate judges are not elected. They do not have their own courts; they assist *806 duly elected judges. And associate judges' "employment" is terminable "at the will of" or "by a majority vote of" the judge or judges whom the associate judge serves. See id. § 201.004(a)-(d).
In contrast, the judgeship for the County Court at Law No. 3 is created by Government Code section 25.0221(3). A person attains this judgeship either by election or by appointment in the event of a vacancy. See generally TEX. CONST . art. V, § 30 (requiring all "Judges of all Courts of county-wide jurisdiction heretofore or hereafter created by the Legislature" to be elected); TEX. GOV'T CODE § 25.0009(a) - (c) (providing for appointment of county court at law judges in event of vacancy); cf. Fashing v. El Paso Cty. Democratic Exec. Comm. , 534 S.W.2d 886, 888-90 (Tex. 1976) (applying Texas Constitution article V, section 30, in suit concerning county courts at law). A county court at law judge exercises certain powers specific to that office. See TEX. GOV'T CODE § 25.0004(a) - (g). The judge is compensated by the county commissioners' court, subject to a statutory compensation floor. See id. § 25.0005(a), (d). And the judge may be "removed from office" only under certain conditions and through certain procedures. See TEX. CONST . art. V, § 1-a (6) (governing removal of county judges from office); TEX. GOV'T CODE § 25.0006(b) (providing for removal of county court at law judges from office "in the same manner and for the same reasons as a county judge"). The Brazoria County County Court at Law No. 3 exercises the jurisdiction conferred on it by Government Code sections 25.003 and 25.0222, which includes jurisdiction over family-law cases.
A referral usually confers on an associate judge the power to hear a trial on the merits of a modification suit pending before a district court. See generally TEX. FAM. CODE §§ 201.005 -.007. In contrast, a county court at law judge may hear a trial on the merits of a modification suit pending before a district court under an independent grant of authority-one that does not require a referral. See TEX. GOV'T CODE § 74.094(a) ; Camacho v. Samaniego , 831 S.W.2d 804, 811 (Tex. 1992) (remarking that Government Code section 74.094(a)"allow[s] a statutory county court judge to hear, determine, and sign a judgment in a matter pending in district court outside his court's jurisdiction without transferring the case"). Section 74.094(a) empowered the judge of the County Court at Law No. 3 to preside over the trial of this suit.
Comparing the provisions that create, empower, compensate, and govern termination of associate judges to the analogous provisions for the judge of the County Court at Law No. 3, we hold that a county court at law judge who sits for a district-court judge is not an "associate judge" as contemplated by Family Code section 201.005. The two offices are governed by distinct provisions. And the judge here could hear the bench trial on the merits under Government Code section 74.094(a), without need of the authority contemplated by the Family Code's referral-unless-objected-to provisions.
Monica argues that the "case should have been tried by the referring judge rather than the associate judge. The associate judge lacked jurisdiction." We do not consider this to be a challenge to the 300th District Court's jurisdiction over this suit. That court undisputedly had jurisdiction over this family-law case. See TEX. GOV'T CODE §§ 24.601, 24.608. The suit was filed in, and was never transferred out of, the 300th District Court. Government Code section 74.094(a) empowered the judge of the County Court at Law No. 3 to preside over the trial while the suit was still pending before the 300th District Court.
*807 We therefore overrule Monica's first issue.
Rule of Civil Procedure 306
In her second issue, Monica contends that the trial court's modification order fails to comply with Rule of Civil Procedure 306. Rule 306 requires that a judgment "state the specific grounds for termination or for appointment of the managing conservator" if the suit is one either "for termination of the parent-child relationship or a suit affecting the parent-child relationship filed by a governmental entity for managing conservatorship." TEX. R. CIV. P . 306. This suit is neither. We therefore overrule Monica's second issue.
Order Modifying Conservatorship-C.V.'s Best Interest and Evidence Sufficiency
Monica also challenges the trial court's decision to grant Erik the exclusive right to determine C.V.'s residence within Brazoria County and contiguous counties. In her third issue, Monica contends that the trial court abused its discretion in making a modification that is not in C.V.'s best interest. In her fourth issue, Monica contends that the modification was an abuse of discretion because the evidence is legally and factually insufficient. We consider the two issues together, given the standard of review and applicable law.
I. Standard of review and applicable law
A trial court's order modifying the parent-child relationship is reviewed for an abuse of discretion. Stamper v. Knox , 254 S.W.3d 537, 542 (Tex. App.-Houston [1st Dist.] 2008, no pet.). Such an order will be disturbed only when it is clear that the court acted in an arbitrary or unreasonable manner, without reference to any guiding principles. Id.
Under the abuse-of-discretion standard applicable to orders modifying the parent-child relationship, legal and factual sufficiency are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. Id. Review in this context is two-pronged: a reviewing court determines whether the trial court (1) had sufficient information on which to exercise its discretion and (2) erred in applying its discretion. Id. Traditional sufficiency review comes into play under the first prong. Id.
To determine legal sufficiency of the evidence, a reviewing court determines whether the evidence would enable reasonable people to reach the judgment being reviewed. Id. The reviewing court must consider the evidence in the light most favorable to the trial court's decision and indulge every reasonable inference that would support it. See Epps v. Deboise , 537 S.W.3d 238, 242-43 (Tex. App.-Houston [1st Dist.] 2017, no pet.). The reviewing court considers favorable evidence that a reasonable factfinder could consider and disregards contrary evidence unless a reasonable factfinder could not disregard it. Stamper , 254 S.W.3d at 542. If the evidence allows for only one inference, the reviewing court may not disregard it. Epps , 537 S.W.3d at 243.
To determine factual sufficiency, a reviewing court considers all of the evidence that either supports or contradicts the factfinder's determination. Id. The factfinder's finding is set aside only if the evidence supporting it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. See ids="12409278" index="42" url="https://cite.case.law/sw3d/537/238/#p242">id. The reviewing court may not simply substitute its judgment for the factfinder's; the factfinder is the sole judge of the *808 witnesses' credibility and the weight to be given their testimony. Id.
In a bench trial, the trial court, as the trier of fact, is the sole judge of the witnesses' credibility and the weight to be given their testimony. Hatteberg v. Hatteberg , 933 S.W.2d 522, 530 (Tex. App.-Houston [1st Dist.] 1994, no writ). The trial court may choose to believe some witnesses over others. Martinez v. Lopez , No. 01-09-00951-CV, 2011 WL 2112806, at *4 (Tex. App.-Houston [1st Dist.] May 26, 2011, no pet.) (mem. op.).
Once the evidence is reviewed in the proper legal- and factual-sufficiency contexts under the first prong, a reviewing court considers under the second prong whether the trial court erred in applying its discretion because it made an unreasonable decision. Stamper , 254 S.W.3d at 542. Ultimately, there is no abuse of discretion as long as some evidence of a substantive and probative character exists to support the trial court's decision. Id.
A trial court may modify the terms of a conservatorship order if the party requesting the modification shows both that there has been a material and substantial change warranting the modification since the date of the last conservatorship order and that the modification is in the child's best interest. See TEX. FAM. CODE § 156.101(a) ; Epps , 537 S.W.3d at 243. The child's best interest is the court's primary consideration. TEX. FAM. CODE § 153.002.
A non-exhaustive list of factors guides a reviewing court about the child's best interest. Epps , 537 S.W.3d at 243. Those factors are (1) the child's desires, (2) the child's emotional and physical needs now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the child's best interest, (6) the plans for the child by the individuals seeking custody, (7) the stability of the home or proposed placement, (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the parent's acts or omissions. Id.
II. Legally and factually sufficient evidence exists, giving the trial court sufficient information on which to exercise its discretion
First, we review the evidence under each of the nine factors that guide review of a best-interest finding. We use the factors to determine whether legally and factually sufficient evidence supports the trial court's ruling.
A. C.V.'s desires
C.V. did not testify, and no witness testified that C.V. has expressed a custody preference. Several witnesses offered testimony that supports a determination that C.V., at a minimum, has no objection to his father having custody. Erik, Pauline, and Shannon described how C.V. gets along well with his extended paternal family. Monica agreed that the paternal familial relationships were good. Monica's mother, too, admitted that C.V. loves Erik, that C.V. increasingly looks forward to seeing Erik, and that C.V. comes back to Monica a happy child after visits with Erik. C.V. enjoys activities with his father, including playing outside, fishing, and going to movies. Notwithstanding Monica's stated concerns about C.V. living with Shannon and her children, Monica admitted that C.V. has expressed interest in staying with Erik, that C.V. has fun around Erik, and that things are better between C.V. and Shannon now. Finally, Dr. Alvarez concluded that C.V. is equally emotionally connected to both parents.
*809 In response, Monica asserts that C.V. told Dr. Alvarez that he wants to keep living with Monica. She offers no record support for that assertion, and we find none. In fact, Monica testified that she is not aware of anyone having asked C.V. who he wanted to live with. Monica references Dr. Alvarez's testimony about C.V.'s therapist's deposition. Dr. Alvarez noted that, during a drawing exercise with the therapist, C.V. was asked which of two barns a horse should go in, understanding that the horse could not stay in both barns. One barn said "Mom" and the other "Dad." C.V. chose the "Mom" barn. Finally, Monica points to a statement made by the therapist during her deposition that C.V. "is worried about having to live with his dad if that were to be the case, that he wants to stay with his mom."
The trial court could have discounted the drawing exercise and deposition statement by C.V.'s therapist for at least two reasons. First, Dr. Alvarez reviewed this information and still recommended that C.V. live with Erik. Second, Monica has, according to Dr. Alvarez, alienated C.V. from his father.
We conclude that this factor is neutral.[3]
B. C.V.'s emotional and physical needs now and in the future
Much of the trial concerned Monica's efforts to alienate C.V. from Erik and the resulting emotional harm to C.V. Based on interviews with C.V., Monica, and Erik, Dr. Alvarez noted "an attempt by Ms. Townsend to influence or alienate [C.V.] from his father by talking to him in ways that will affect" the father-son relationship. Both Erik and Dr. Alvarez were concerned by Monica's behavior.
Dr. Alvarez concluded that many of Monica's allegations against Erik after the 2012 custody order-allegations of physical abuse against Monica and improper drinking around C.V.-were too riddled with inconsistencies to be true. Monica caused Erik to be subjected to drug and alcohol testing, he passed the tests, and the tests were discontinued. Monica admitted that Erik has since quit drinking around C.V. and that she no longer worries that C.V. is unsafe with Erik because of drug or alcohol abuse.
Dr. Alvarez testified that Monica's attempted alienation and untruthfulness supported her conclusion that C.V. was better off living with his father and that Monica should have a standard possession order. The amicus attorney for C.V. agreed.
Monica responds by pointing out her past care and support for C.V. throughout his entire life, including as it relates to school activities, medical care, and psychiatric care. She has been C.V.'s primary caregiver, and C.V. is attached to her. But C.V. is likewise attached to Erik, who has expressed his willingness and desire to assume the primary role in caring for C.V. Erik also has the support of his other family members.
In her motion for rehearing, Monica points to C.V.'s personal therapist's deposition, which she argues undercuts Dr. Alvarez's and the trial court's conclusion that she was an alienating parent. Specifically, *810 she points to the therapist's testimony about Monica's decision to keep C.V. in personal therapy and the therapist's inability to recall C.V. saying anything negative about Erik. But, in reaching her conclusions, Dr. Alvarez reviewed this therapist's deposition and spoke with the therapist. Dr. Alvarez nevertheless concluded that C.V. was better off living primarily with Erik, noting that the therapist "never attempted to reach out to" Erik or "understand an entirely new set of historical facts and information" that he could have provided for context, if asked. In light of this, and in light of the amicus attorney's joining Dr. Alvarez's recommendations, the trial court was within its rights to believe Dr. Alvarez and to discount contrary testimony. See Epps , 537 S.W.3d at 243 ; Martinez , 2011 WL 2112806, at *4 ; Hatteberg , 933 S.W.2d at 530.
This factor favors Erik.
C. Emotional and physical danger to C.V. now and in the future
Dr. Alvarez's testimony about Monica's attempt to alienate C.V. from his father-which Dr. Alvarez noted some psychologists consider child abuse-suggests emotional danger to C.V. now and in the future if C.V. were to continue living primarily with Monica. Dr. Alvarez testified that children's psychological development "is negatively impacted and developed by parents that work to alienate the [child] from one parent." She opined that Monica's explanation to C.V. about the need for a police presence at visitation exchanges created a psychological framework that communicated to C.V. that Monica was "so afraid of Mr. Vasquez that they can't meet at any other place. And that is a form of parental alienation trying to influence the relationship between [C.V.] and his father by presenting Mr. Vasquez as an abusive monster." There is record evidence that would support the inference that Monica feared Erik due to his past physical aggression with her. Erik had been convicted twice of domestic abuse against her before C.V.'s birth, and Monica testified that C.V. had witnessed his parents in a physical altercation. But Monica did not take the position at trial that the police presence was necessary because she feared Erik. Instead, she explained that she had asked for custody exchange at the police station because Erik's family had acted aggressively toward her at prior exchanges. Erik himself rarely was present for the exchanges.
Moreover, Monica testified that she does not believe that Erik puts C.V. in danger or that his visitations need to be supervised. In her report, Dr. Alvarez detailed a history of inconsistencies in Monica's communications to others about whether Erik had ever hurt C.V.:
Additional inconsistencies in Ms. Townsend's historical accounts include telling the Fort Bend Women's Center in June 2012 that [C.V.] was emotionally and psychologically abused by his father, but denying any physical abuse or violence towards him. At a later date, Ms. Townsend denied that [C.V.] was abused at all by his father to [another psychologist] in September 2014, but in February 2015 to CPS, Ms. Townsend alleged that Mr. Vasquez choked Christopher when he was a younger child.
Thus, Monica's explanation to C.V. about the need for police presence, as discussed by Dr. Alvarez, was not consistent with Monica's explanation to the court, and the trial court could have reasonably concluded that it supported Dr. Alvarez's suggestion of parental alienation.
Monica also suggests that statements by C.V. to his therapist show that he has been afraid of Erik, feels unsafe in Erik's home, and has been mistreated by Shannon. Dr. Alvarez testified that Monica suggested *811 these fears to C.V. to alienate him from his father. The trial court, as sole judge of witness credibility in this bench trial, was entitled to believe Dr. Alvarez on this topic. See Epps , 537 S.W.3d at 243 ; Martinez , 2011 WL 2112806, at *4 ; Hatteberg , 933 S.W.2d at 530.
This factor favors Erik.
D. Erik's and Monica's parental abilities
Monica has been C.V.'s primary caregiver his whole life. C.V. has not lived with Erik for most of his life. Monica is involved in C.V.'s schooling and improving his grades. She has borne the greater share of taking care of C.V.'s medical needs. Erik has been largely absent from those efforts. During this suit, Monica also completed several parenting classes and testified that she has used what she learned to improve her parenting.
Dr. Alvarez compared Erik's and Monica's parental abilities by performing personality testing and parental testing on both parents. Both parents took a Personality Assessment Inventory. This allowed Dr. Alvarez to consider both parents' truthfulness. Erik's responses in this inventory gave Dr. Alvarez "more confidence in describing" what the later parental-test results would show "because he was truthful and did not score in the clinical range on the validity scale." But Monica "responded in a way that was not truthful," undermining any confidence that Dr. Alvarez would otherwise have in Monica's parental-test results. Monica frequently denied or masked "problems, pathology, and personality difficulties." According to Dr. Alvarez, Monica suffers from some psychopathologies, including frequent untruthfulness, agenda-driven interactions with others, "under-report[ing of] the common faults that the vast majority of the adult population readily admits having," moderate anxiety, somatization, possible depression, "attention-seeking and dramatic" behaviors, and narcissism. But Erik has no "significant psychological disorders," save for some traits of narcissism and obsessive-compulsive behaviors.
Erik's Parent Awareness Skills Survey and Parent-Child Relationship Inventory scores were within the normal range, according to Dr. Alvarez, although he needed to improve encouraging autonomy in C.V. In contrast, Monica's responses to the Personality Assessment Inventory suggested that she "was not truthful." Therefore, Dr. Alvarez could not have complete confidence in Monica's results on the later parental-test results. Dr. Alvarez also opined that C.V. behaves better when with Erik.
In her report, Dr. Alvarez concluded that Erik "has more awareness of critical parent/child issues, better overall ability to developmentally appropriate language, and a better ability to consider how the child feels given the parenting situation" but that Monica "exhibited better ability to integrate information in order to parent in a variety of situations/conditions."
Based on Dr. Alvarez's testimony, which we are to presume the trial court credited because it supports the trial court's judgment, we conclude that this factor slightly favors Erik.
E. Programs available to assist Erik or Monica in promoting C.V.'s best interest
Monica has ensured that C.V. received therapy for several years, and she has regularly attended meetings with school personnel to address C.V.'s low-but-improving school performance. Therapy has helped C.V. address concerns about his interactions with Shannon and her children. It also has helped C.V. work through issues relating to PTSD, anxiety, ADHD, and learning difficulties. Living with Erik outside of Fort Bend County will preclude *812 C.V. from using the same therapist's services because that therapist only serves Fort Bend County residents. Erik has never reached out to the therapist Monica retained for C.V.
Monica has also attended meetings with school personnel to address C.V.'s performance. In contrast, Erik has had limited involvement with helping C.V.'s school performance, even though online tools have been available to him to monitor C.V.'s performance.
Erik responds that all the "programs available to promote the best interests of the child are equally available to both parents." In a general sense this may be accurate, but it ignores that C.V.'s longtime therapist will not be available to C.V. if he lives in Brazoria County with Erik. Erik also points out that the trial court's order provides that both parents have the right, subject to the other's agreement, to consent to medical and psychological treatment for C.V. But so did the original custody order, yet Erik failed to stay engaged in C.V.'s medical and psychological care or his school performance.
This factor favors Monica.
F. Erik's and Monica's plans for C.V.
Both parents claim that they are better suited to prepare C.V. for his future. Monica has invested significant time helping C.V.'s education and obtaining therapy for him. Dr. Alvarez interviewed each parent several times and concluded that C.V. was better off living with his father. While Monica's interactions with C.V., as they related to his father, introduced feelings of fear and anxiety for C.V., Erik's interactions were healthier. Erik's home and family support are likewise beneficial and preferable for C.V.'s development, according to Dr. Alvarez.
Given the recommendations of Dr. Alvarez, a neutral licensed psychologist, this factor favors Erik.
G. The stability of Erik's home
Dr. Alvarez's interviews with each parent led her to conclude that Erik's home was a better environment for C.V. Her impressions were that Erik was truthful but that Monica was not. Shannon, who lives with Erik, and Erik's parents, who live nearby, are involved in C.V.'s life, and C.V. enjoys spending time with each of them.
Monica raises some of C.V.'s prior complaints about Shannon's sons hurting him and about not feeling comfortable around Shannon. Notwithstanding these earlier concerns, Monica testified that she does not believe that C.V. is unsafe in Erik's care or that Erik's visitation must be supervised. Monica faults Dr. Alvarez's failure to interview Shannon and the other children and notes critically that Dr. Alvarez's interviews of the family and her final report's issuance happened a year or more before trial. These criticisms of Dr. Alvarez's evaluation processes go to Dr. Alvarez's credibility, which we may not second-guess. See Epps , 537 S.W.3d at 243 ; Martinez , 2011 WL 2112806, at *4 ; Hatteberg , 933 S.W.2d at 530.
Dr. Alvarez concluded in her report and in her testimony that Erik's home was a better environment for C.V. Therefore, this factor favors Erik.
H. Monica's acts or omissions that indicate that the current custodial placement is improper and any excuses for those acts or omissions
Dr. Alvarez's opinions about Monica's attempts to alienate C.V. from his father also bear on these factors, as does Monica's surreptitiously recording of all C.V.'s phone calls with Erik. Dr. Alvarez testified that the efforts by Monica to paint Erik in a harsh light to C.V. were harmful to C.V.
*813 These factors favor Erik.
In sum, of the nine best-interest factors, only one favors Monica. Her alienating conduct played a central role in Dr. Alvarez's custody recommendation. The trial court reasonably could have concluded that Dr. Alvarez's opinion about Monica's untruthfulness undermined Monica's credibility. So while Monica has done much good in her parenting, the trial court reasonably could have concluded that her intentional and repeated alienation of C.V. from his father strongly suggested that custody should be modified. We hold that the evidence before the trial court was legally sufficient to support the order modifying custody in Erik's favor because we cannot say that a reasonable person could not have reached the same judgment on the same facts. See Stamper , 254 S.W.3d at 542. We also hold that the evidence was factually sufficient because the evidence supporting the modification was not so contrary to the overwhelming weight of the evidence as to make the order clearly wrong or unjust. See Epps , 537 S.W.3d at 243.
III. The trial court did not err in applying its discretion to the evidence
Under the second prong of abuse-of-discretion review, Monica offers several reasons, either in her opening brief or in her motion for rehearing, why she believes Dr. Alvarez's testimony was not credible-Dr. Alvarez ignored C.V.'s therapist's deposition testimony, Dr. Alvarez's methodology was flawed, C.V.'s therapist is more credible than Dr. Alvarez, Dr. Alvarez never interviewed Shannon or her children, and Monica's personal therapist reached different conclusions about her mental health. And in her motion for rehearing, Monica adds other considerations-Dr. Alvarez failed to consider Erik's 2005 and 2006 convictions for family violence; a court-ordered substance-abuse evaluator reported that Monica "is motivated to complete the requirements of the Court" and "appeared honest and open throughout the clinical interview"; C.V.'s personal therapist had spent more time with him than Dr. Alvarez had; and parental alienation is not a diagnosable condition.[4] All these observations concern Dr. Alvarez's credibility, which the trial court was within its discretion to judge favorably, including by discounting Monica's contrary testimony.[5] See Epps , 537 S.W.3d at 243 ; Martinez , 2011 WL 2112806, at *4 ; Hatteberg , 933 S.W.2d at 530. The same goes for Monica's contention that the "judge put too much weight towards the amicus attorney opinion."[6]
We cannot say that the trial court made an unreasonable decision. See *814 Stamper , 254 S.W.3d at 542. We overrule Monica's third and fourth issues.
Conclusion
We affirm the trial court's order. Also, the Court has voted to deny the motion for en banc reconsideration.[7]

C.V.'s school grades lowered during this suit but, closer to trial, and since meeting with school personnel, have started to rebound.

Monica also asserts that "Family Code 153.008 allows [a] child 10 years of age or older to state a preference for managing conservator." That statute was repealed in 2009, however, before this suit was filed. See Act of May 29, 2009, 81st Leg., R.S., ch. 1113, § 31, 2009 Tex. Gen. Laws 3056, 3072; Act of May 29, 2009, 81st Leg., R.S., ch. 1118, § 10, 2009 Tex. Gen. Laws 3078, 3082. The current statute, Family Code section 153.009, allows, but does not require, a court to interview in chambers children under 12 years of age to determine the child's living preference. C.V. was 10 years old at the time of trial. There is no record of any such interview in the record before us.

Also in her motion for rehearing, Monica directs us to documents that she filed with the court post-trial and in connection with a hearing on the court reporter's contest to Monica's affidavit of inability to pay costs. Monica does not indicate that these documents were entered into evidence at trial, and the record suggests that they were not.

Monica also contends that Dr. Alvarez violated Family Code subsections 107.108(a), (c), and (e). But she does not explain how Dr. Alvarez allegedly failed to conform with the applicable standard of care for her licensure and any guidelines adopted by the authority that licensed her (subsection (a) ), to "follow evidence-based practice methods and [to] make use of current best evidence" (subsection (c) ), or to verify the fact statements in her report (subsection (e) ). Both Dr. Alvarez's report and her testimony reveal the sources for her opinions. Monica forfeited her Family Code section 107.108 contentions by inadequately briefing them. See Tex. R. App. P . 38.1(i).

Monica complains that the amicus attorney violated Family Code subsections 107.005(a) and (b). But she does not explain how the amicus attorney failed to interact with C.V. or the court or failed to study the relevant American Bar Association child-representation standards. She therefore forfeited those complaints. See Tex. R. App. P . 38.1(i).

The Court en banc consists of Chief Justice Radack and Justices Jennings, Keyes, Higley, Bland, Massengale, Brown, Lloyd, and Caughey.