**Opinion issued April 7, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00016-CV

————————————

**THOMAS MALONE, Appellant/Cross-Appellee**

**V.**

**PLH GROUP, INC. AND POWER LINE SERVICES, INC., Appellees/Cross-Appellants**

On Appeal from the 295th District Court
Harris County, Texas
Trial Court Case No. 2015-24766

## MEMORANDUM OPINION

Thomas Malone worked for Power Line Services, Inc. under an employment agreement that contained a provision for severance pay if Malone were to be terminated without cause. PLS terminated him without cause but did not pay him a severance. Malone sued PLS and its parent company, PLH Group, Inc., asserting

multiple causes of action, including breach of contract. PLS and PLH Group counterclaimed for breach of contract and misappropriation of trade secrets. After a bench trial, the trial court entered take-nothing judgments against all parties. All parties appealed.

In six issues, Malone argues the trial court made multiple errors of law and there was legally insufficient evidence to support the trial court's judgment. He also challenges the trial court's rulings in connection with the denial of his claims for attorney's fees.

In two issues, PLS and PLH Group argue the trial court erred in denying them equitable relief.

We affirm.

## Background

PLS constructs electrical transmission lines, builds substations and distribution systems, and provides construction and maintenance services. In 2014, Malone entered into a three-year employment agreement with PLS to be its Vice President of Operations. The employment agreement contained restrictive covenants to prohibit Malone from competing against PLS, soliciting PLS's employees, and using or disclosing confidential company information. The employment agreement contained a provision for injunctive relief, whereby Malone agreed any breach of the restrictive covenants would cause irreparable

2

damage to PLS and that, in the event he were to breach the covenants, PLS "will be entitled as a matter of right to equitable relief, including temporary or permanent injunction, to restrain such breach."

The employment agreement also contained a provision for severance pay, providing that, if Malone were to be terminated without cause, the company would pay one year of salary as severance pay unless either of two specified events occurred. Severance pay would not be owed if Malone failed to "execute a general waiver and release of claims agreement in the Company's customary form" within 30 days of termination without cause. It also would not be owed if Malone were to "violate any Restrictive Covenants" from his 2014 employment agreement during his period of employment or during the first year after his termination.

Malone signed the 2014 employment agreement without negotiating the terms of the restrictive covenants or the severance-pay obligation.

When Malone entered into the employment agreement with PLS, he had a pre-existing professional role in another company. He owned MMT, Inc., which is a minority-owned business that performed building maintenance services on federal government properties. Malone ran MMT from the same office location as PLS. PLS knew he did so. To the extent Malone's roles at the two entities did not conflict or violate the restrictive covenants, the coexisting roles were agreeable to all parties.

An issue arose about MMT while Malone was employed with PLS. It came to PLS's attention that Malone's MMT website listed various services it could provide clients and included in that list utility service consulting work, which was a service provided by PLS. PLS approached Malone about the possible conflict. Malone stated he was not providing such services through MMT. PLS requested that Malone remove the reference to utility service consulting from the MMT website, and Malone did.

In early 2015, which was about one year after entering into the employment agreement, PLS terminated Malone without cause. PLS provided Malone a general waiver and release of claims agreement—otherwise known as a separation agreement—to sign to access his severance pay. The agreement waived all claims Malone might have against PLS. It also stated that "nothing in this Agreement is intended to alter or change [Malone's] prospective obligations pertaining to the restrictive covenants, as set forth and defined in [Malone's 2014] Employment agreement, which [Malone] executed in connection with and in consideration for his continued employment."

Malone would not sign the agreement as written. The change Malone wanted was not the deletion of terms from the release or some other narrowing of the release. Instead, the change Malone wanted was the addition of new terms to the release. Immediately below the above quoted language, Malone sought to add

4

terms that would have altered the scope of the non-compete and confidentiality clauses in his original 2014 employment agreement.

The 2014 employment agreement had provided that Malone would not directly or indirectly use or disclose any confidential or proprietary information or trade secrets of or relating to PLS, including information about PLS's business practices, customers, potential customers, and bidding practices. And it provided that he would not directly or indirectly engage in any business located where PLS operates that provides any service that may be used as a substitute for or competes with PLS's services or for which PLS has taken active steps to engage in or acquire. The employment agreement stated that the restricted period for the restrictive covenants would extend throughout Malone's employment and for one year after his termination, which was the same duration as the severance payments.

The terms Malone sought to include in his 2015 separation agreement would have limited Malone's ongoing obligations under both the non-compete and the confidentiality clauses. Malone proposed adding this limitation: the restrictive covenants detailed in the 2014 employment agreement are "only intended to preclude [Malone] from using information gained from [PLS] in competition with [PLS] for electric power line, pipeline and oilfield electrical service clients, and not to preclude [Malone] from utilizing his education and experience [1] for other

5

markets or [2] for products and services in the electric power line, pipeline and oilfield electrical service markets not served by [PLS]."

PLS rejected Malone's addition. Nevertheless, Malone signed a version of the separation agreement that included his proposed language and returned the signed document to PLS, claiming he had signed the company's release and was therefore owed severance payments. PLS refused to pay him any severance, citing (1) his failure to sign the agreement "in the Company's customary form" and (2) its later-developed contention, based on information learned post-termination, that Malone had contacted PLS customers on behalf of his MMT entity and had forwarded PLS confidential information to his MMT email address.

When PLS would not pay Malone any severance, Malone sued PLS and PLH Group for breach of contract, fraud, and other causes of action. PLS and PLH Group (collectively, PLS) counterclaimed for breach of contract and misappropriation of trade secrets.

The trial court held a bench trial and entered a take-nothing judgment against all parties. Both parties appealed.

**Malone's Breach-of-Contract Claim**

Malone argued at trial that PLS breached its contract when it failed to pay him a severance. The trial court ruled that Malone did not comply with the contractual prerequisites to access severance pay in that he did not execute a

6

waiver and release agreement "in the Company's customary form," as required by the 2014 employment agreement to qualify for severance pay. Malone argues he did comply because the terms he added to the separation agreement did not alter the scope of his waiver and release—which was the focus of that 2015 separation agreement—but, instead, "addressed the scope of a covenant not to compete" found in his 2014 employment agreement.

## A. Standard of review

A trial court should construe an unambiguous contract as a matter of law, and, on appeal, the court's ruling is subject to de novo review. *Choice! Power, L.P. v. Feeley*, 501 S.W.3d 199, 205 (Tex. 2016). In construing a written contract, the primary concern is to "ascertain the true intent of the parties, as expressed in the instrument." *Id.* at 206. The intent of the parties usually can be discerned from the instrument itself. *Id.*

"Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). "We examine and consider the entire writing to harmonize and give effect to all provisions so that none is rendered meaningless." *Choice! Power*, 501 S.W.3d at 206. We may not consider any single provision in isolation as

controlling but must, instead, consider all provisions in context of the entire instrument. *Id.*

Contracts may contain conditions precedent. "A condition precedent can be either a condition to the formation of a contract or a condition to an obligation to perform an already existing agreement." *Sacks v. Hall*, 481 S.W.3d 238, 249 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). The latter type of condition precedent involves an act or event "that must occur before there is a right to immediate performance or before there is a breach of a contractual duty." *Id.*

**B.      Malone's actions disqualified him from severance pay**

Malone's 2014 employment agreement provided that he would be paid a severance only if certain conditions were met, including that he timely signed a separation agreement "in the Company's customary form." PLS provided him a separation agreement in 2015 when it terminated him without cause. PLS's employee, C. Lam, testified the separation agreement PLS gave Malone to sign was the company's customary form used for all employee terminations.

Malone added terms to the 2015 separation agreement before he signed it. Malone seeks to minimize the change by noting it "addressed" the scope of the 2014 employment agreement's restrictive covenants, not the scope of the 2015 separation agreement's waiver or release.

Malone fails to articulate any legal argument why, upon his termination, he was permitted to amend a form separation agreement to alter the terms of an earlier-executed employment agreement to lessen those contractual obligations. We are unaware of any theory of contract law that would support Malone's argument that, so long as he does not delete any relevant terms in a proposed separation agreement, he may add terms to that agreement to amend an earlier-executed contract and still maintain that he executed the separation agreement "in the Company's customary form."

The unambiguous terms of both agreements contradict his argument. First, the 2014 employment agreement states that Malone will not be paid a severance if he violates any restrictive covenant as therein defined and described. Second, the 2015 separation agreement—even after Malone's unilateral edit—states that "nothing in this Agreement is intended to alter or change [Malone's] prospective obligations pertaining to the restrictive covenants, as set forth and defined in [his] Employment Agreement."

All parties agree that executing a separation agreement in PLS's customary form was a condition precedent to Malone receiving severance pay. Lam testified the form provided to Malone was PLS's customary form. Malone agreed he would not sign it without his added language revising his contractual obligations under the 2014 employment contract. The trial court did not err in concluding Malone

failed to satisfy the condition precedent of executing a separation agreement "in the Company's customary form" to qualify for severance pay.

Because Malone did not comply with the condition precedent, PLS had no contractual obligation to pay a severance. Thus, the trial court did not err in concluding Malone failed to establish his breach of contract claim. *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998) ("A party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied."). We overrule Malone's third and fourth issues.

## C.    Malone's claim for attorney's fees on his breach-of-contract claim

Because Malone did not prevail on his breach-of-contract claim, his claim for attorney's fees under Section 38.001 on the Civil Practice and Remedies Code likewise failed. *See* TEX. CIV. PRAC. & REM. CODE § 38.001(8) (providing for recovery of reasonable attorney's fees on successful breach-of-contract claim). Accordingly, we overrule as moot Malone's fifth issue, challenging an evidentiary ruling related to his proof of attorney's fees in support of his breach-of-contract claim.

### Malone's Legal Sufficiency Argument

Malone argues there is legally insufficient evidence to support the trial court's judgment because the evidence conclusively establishes the opposite of the

trial court's ruling. Specifically, he argues his evidence established he was owed a severance. We have already determined the trial court did not err in concluding Malone's breach-of-contract claim failed because he did not comply with the condition precedent. There was legally sufficient evidence that PLS provided Malone a separation agreement in the company's customary form and that Malone refused to execute the agreement in that form.

We overrule Malone's first issue.

### Malone's TUTSA Attorney's Fee Claim

Next, Malone argues that he has a statutory right to attorney's fees on PLS's claim for misappropriation of PLS's trade secrets.

The Texas Uniform Trade Secrets Act provides that a "court may award reasonable attorney's fees to the prevailing party if: (1) a claim of misappropriation [of trade secrets] is made in bad faith . . . ." TEX. CIV. PRAC. & REM. CODE § 134A.005(1). It is within the trial court's discretion to award attorney's fees on bad-faith claims. *See Performance Pulsation Control, Inc. v. Sigma Drilling Technologies, LLC*, No. 05-17-01423-CV, 2018 WL 6599180, at *1–2 (Tex. App.—Dallas Dec. 17, 2018, no pet.) (mem. op.) (noting abuse-of-discretion standard for award of attorney's fees on bad-faith TUTSA claim). When applying the abuse-of-discretion standard, we will reverse "only if the trial court acted without reference to any guiding rules or principles such that the ruling was

11

arbitrary or unreasonable." *Id.* at *2 (quoting *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007)).

Malone argues an "absence of evidence" in support of PLS's TUTSA claim "suggests bad faith." Yet Malone offers no argument why the trial court's decision to deny attorney's fees on these facts was an abuse discretion. Without any argument why the denial of attorney's fees abused the trial court's discretion, we overrule Malone's sixth and final issue.

### PLS's Claim for Equitable Relief

PLS contends the trial court abused its discretion in denying it injunctive relief for Malone's violation of TUTSA and the confidentiality provision of Malone's employment agreement. We consider first the alleged TUTSA violation.

### A. Injunctive relief for TUTSA violation

PLS argues it was entitled to injunctive relief because Malone violated TUTSA by forwarding confidential PLS trade secrets to his MMT email address, thereby misappropriating confidential information.

The trial court's findings on this matter were as follows. First, the trial court found that Malone transmitted PLS's bid log report from his PLS email account to his MMT email account. Second, it found that PLS established the transfer violated the confidentiality restrictive-covenant provision in Malone's employment agreement. And, third, it found that PLS did not met its burden of persuasion to

establish by a preponderance of evidence that Malone misappropriated its trade secrets in violation of TUTSA with the transfer. Based on those findings, the trial court denied PLS the equitable relief it requested, which was an injunction.

A plaintiff may recover for misappropriation of a trade secret by establishing (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or was discovered by improper means, (3) the defendant used the trade secret without the plaintiff's authorization, and (4) the plaintiff suffered damages as a result. *Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366–67 (Tex. App.—Dallas 2009, pet. denied). Here, the third element is in dispute—whether Malone "used" the trade secret.

PLS argues the element of "use" can be satisfied with a showing that Malone was in possession of its trade secret, even if he did not affirmatively use it. The cases on which PLS relies to make this argument analyzed whether to award pretrial temporary injunctive relief on misappropriation claims. *See, e.g.*, *TFC Partners, Inc. v. Stratton Amenities, LLC*, No. 1:19-CV-58-RP, 2019 WL 369152 (W.D. Tex. Jan. 30, 2019). It is accurate that, in the pre-trial temporary-injunctive-relief context, a trade-secret owner is not required to prove that its ex-employee is actually using a trade secret to be entitled to temporary injunctive relief. The owner "need only prove that he is in possession of the information and is in a position to

use it." *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 860 (Tex. App.—Fort Worth, no pet.); *see Hughes v. Age Industries, Ltd.*, No. 04-16-00693-CV, 2017 WL 943423, at *5 (Tex. App.—San Antonio Mar. 8, 2017, no pet.) (mem. op.) ("Because the very purpose of an injunction is to prevent disclosure of trade secrets pending trial, an applicant is not required to show the defendant is actually using the information."). But this is not a pretrial request for temporary injunctive relief. On the contrary, this is an appeal of a judgment entered after trial on the merits, at which PLS had the burden to establish all elements of its TUTSA claim, including "use."

In a merits trial, "[a]ctual and unauthorized use of trade secrets must be proved to prevail on a misappropriation claim." *Eagle Oil & Gas Co. v. Shale Expl., LLC*, 549 S.W.3d 256, 273 (Tex. App.—Houston [1st Dist.] 2018, pet. dism'd). In this context, "use" means "commercial use for the purpose of profit," and includes "use likely to injure the secret's owner, enrich the defendant, or aid the defendant in its own research and development." *Id.*; *see Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 450–51 (5th Cir. 2007) ("[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use' ... [including] relying on the trade secret to assist or accelerate research or development ....").

Malone admitted he forwarded the PLS bid log to his MMT email account. He testified he forwarded it from his PLS email account to his MMT email account a few minutes before 9:00 a.m. on a Monday. He explained PLS held weekly "bid log calls" at 9:00 a.m. on Mondays. The bid logs were complex and could not be easily viewed from the computer screen. So, he needed to print the reports for use during bid log calls. Malone had trouble printing from his PSL computer at times. This email was forwarded a few minutes before a 9:00 a.m. call. So, he surmised, he forwarded the report to his MMT email account, which he opened from his MMT computer, and he successful printed the report for use during the imminent meeting. Malone noted that, had he been able to print the report from his PLS email account on his PSL computer, it would have printed to the same printer, would have been used by the same person—him—and would have been physically held in the same office space, which he used for both companies, with PSL's knowledge and consent.

In a bench trial, the trial judge is the factfinder and the sole arbiter of witness credibility. *Townsend v. Vasquez*, 569 S.W.3d 796, 807–08 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). The trial judge was free to credit Malone's explanation and to conclude that forwarding the PLS report to his other email account for the sole purpose of printing the PLS report for use on a PLS call in furtherance of PLS's business did not establish the element of "use" of trade

15

secrets for a misappropriations claim. Under Malone's explanation, the forwarding of the report did not injure PLS or enrich Malone.

PLS has not established error in the trial court's ruling that it failed to meet its burden to establish all elements of its TUTSA claim to support injunctive relief.

**B.     Injunctive relief for continuing violation of confidentiality provision**

PLS argues it was entitled to injunctive relief because Malone violated the confidentiality provision of his employment agreement when he forwarded the bid logs from his PLS email account to his MMT email account, relying on a clause in that employment agreement in which Malone agreed a violation of a restrictive covenant would entitle PLS "as a matter of right to equitable relief, including temporary or permanent injunction, to restrain such breach."

Malone explained at trial that he forwarded the email minutes before a PLS bid log call so he could print the report for the PLS call. He also stated he has since looked through his emails and deleted all PLS materials. In other words, according to his testimony, Malone no longer possesses electronic versions of PLS materials.

The trial court found Malone violated the confidentiality provision of his employment contract when he forwarded the PLS bid log report from his secure PLS email account to his private MMT email account. But the trial court also found PLS failed to meet its burden of persuasion to establish by a preponderance of evidence that Malone engaged in a "continuing violation" of his obligations

16

under the confidentiality provision, and, therefore, denied equitable relief. In other words, the trial court found PLS failed to establish that Malone still possessed confidential materials for which injunctive relief could provide a remedy.

In a bench trial, the trial court is the factfinder and the sole arbiter of witness credibility. *Townsend*, 569 S.W.3d at 807–08. The trial court was free to credit Malone's testimony, and there was sufficient evidence in Malone's testimony to support the trial court's finding. *See id.*

What is more, a contracting party's acknowledgment that the other contracting party has a right to equitable relief does not bind judicial actors or require a court to grant the equitable relief ultimately requested. Trial courts are afforded discretion in granting equitable relief. *Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 428–29 (Tex. 2008). PLS cannot remove that discretion by eliciting a contractual term from Malone authorizing injunctive relief. *Cf. Shoreline Gas, Inc. v. McGaughey*, No. 13-07-00364-CV, 2008 WL 1747624, at *11 (Tex. App.—Corpus Christi April 17, 2008, no pet.) (mem. op.) (party seeking injunctive relief for breach of contract pointed to contract language authorizing injunctive relief but, as the intermediate appellate court noted, "pointed [the court] to no Texas case holding that an agreement such as this establishes, for injunction purposes, that remedies at law will be inadequate or that irreparable injury will necessarily be suffered").

Having concluded that the trial court did not err in denying PLS injunctive relief, we overrule PLS's two issues.

## Conclusion

We affirm.

Sarah Beth Landau
Justice

Panel consists of Chief Justice Radack and Justices Landau and Hightower.