

# NUMBER 13-18-00274-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

### IN THE INTEREST OF C.I.B., A CHILD

### On appeal from the County Court at Law No. 5
### of Nueces County, Texas.

# MEMORANDUM OPINION
### Before Justices Benavides, Hinojosa, and Tijerina
### Memorandum Opinion by Justice Benavides

By two issues, appellants Mother and Father argue that the evidence was legally

and factually insufficient to support the trial court's decision to appoint the Department of

Family and Protective Services (the Department) as C.I.B.'s[1] sole managing conservator

and not to appoint the parents as possessory conservators. We affirm.

---

[1] To protect the identity of the minor child who is the subject of this appeal, we refer to the parties by their initials. *See* TEX. R. APP. P. 9.8; TEX. FAM. CODE ANN. § 109.002(d). Appellants are Mother I.E.B. and Father P.B.

## I.  BACKGROUND

**A.    Removal**

In October 2016, the Department filed a petition to remove nine-year-old C.I.B. from her parents' care and to place her with her maternal grandmother, P.E. The affidavit filed in support of the petition by LaToya Moore, a Department caseworker, alleged that:

- Mother was abusing alcohol and taking medication at the same time;

- Mother had arrived at school drunk to pick up C.I.B. multiple times;

- Mother has a history of drug and alcohol abuse;

- C.I.B. missed school to stay home and take care of her mother in March 2016;

- Mother refused to take a drug test but agreed to complete a substance abuse program and undergo random drug screenings;

- On June 18, 2016, the Corpus Christi Police Department (CCPD) was called to Mother and Father's residence due to a report of a disturbance. The call stated that Father was intoxicated and a window was broken. Mother stated that Father placed her in a chokehold. Mother stated she never contacted the police about past assaults but admitted to other occurrences. Father was arrested. C.I.B. was present;

- On September 9, 2016, neighbors heard Mother and Father fighting and stated that law enforcement has been called to their home;

- P.E. received a call from Mother on September 9, 2016, who said that she and Father were hitting each other over the head. P.E. called the Department and her contact advised her to call CCPD.

On September 12, 2016, the Department' s investigator and Moore met with Mother and C.I.B.'s paternal grandfather, Israel Gomez, to address concerns over the domestic disputes that had occurred. Father was in the hospital for seizures. Mother complained that her case had been open for four months and she no longer wished to comply; she refused to sign a safety plan; and refused to place C.I.B. out of her house to ensure

C.I.B.'s safety. Gomez told Moore that C.I.B. deserves to be raised in a more normalized environment and that if C.I.B. goes with him he does not have to comply with Department restrictions or assessments. He stated he would not limit Mother and Father's access to C.I.B. and has no plan to ensure that Mother and Father get the services they need, as those are not priorities for him.

On September 15, 2016, Mother and Father signed an authorization for non-parent or voluntary caregiver agreement allowing C.I.B. to stay with P.E. until further notice from the Department.

On September 23, 2016, CCPD Officer Eric Huerta was contacted by maternal grandmother P.E. when Mother showed up at P.E.'s home to remove C.I.B. from her care. Mother had a strong odor of alcohol on her breath and her speech was slurred. Mother was with Gomez who was sober. Officer Huerta advised Mother it was not in C.I.B.'s best interest to leave with Mother in her condition, but he could not prevent her from taking C.I.B.

According to Moore's affidavit, C.I.B. outcried to witnessing domestic violence between her mother and father on October 5, 2016, and reported that:

> she has witnessed her father hit her mother and has seen her mother throw plates at her father. She has witnessed her parents consuming alcohol and stated they acted weird and scare her. She is afraid to return home to her parents and she feels safe with her maternal grandmother, but her parents pick her up and make her go home. C.I.B. reported that they always fight and her father advised her not to tell anyone what happens in the home.

### B. Department's Pre-Removal Efforts

In April 2016, when the Department first investigated allegations of neglect of C.I.B., the Department recommended that Mother and Father complete substance abuse

3

services, random drug testing, individual counseling as needed for C.I.B., and one-on-one parenting classes. In addition, Father was referred for services as the victim of domestic violence. Mother was referred for counseling with a psychiatrist for her ongoing mental health issues that required medication. Both parents denied allegations of domestic violence and substance abuse and were initially resistant to services but agreed to comply.

During Father's May 31, 2016 substance abuse assessment he admitted to using cocaine over the past two years and to recreational use of marijuana. He also exhibited signs of anxiety. The counselor recommended he complete an outpatient program to address his substance abuse, anger issues, family dynamics, and stress.

Mother was also recommended to complete an outpatient relapse prevention program to address her alcoholism, decision-making skills, and family dynamic issues. Mother admitted to drinking alcohol while taking her medication for bipolar depression. Over several months, the parents completed four group sessions, four individual sessions, and failed to complete any other services.

Moore's affidavit included prior Department history and arrest history for Mother and Father. Mother has prior history with the Department for neglectful supervision stemming from a report in 2010 when she left three-year-old C.I.B. and another older child, L.B., home alone for several hours while Mother was intoxicated. Mother admitted leaving the children alone, which resulted in her arrest. There was another allegation that she slapped L.B., and the Department found reason to believe that allegation.

Mother had a criminal history consisting of an arrest in January 2010 for the offense of assault causing bodily injury to a family member; a November 2013 arrest for a Class

C misdemeanor liquor violation; and in November 2015 another arrest for an assault causing bodily injury to a family member. Father was arrested on September 3, 2016 for assault by contact.

## C.  Pre-Trial

After C.I.B. was removed, she remained with her grandmother until the trial. She did well in school and by time of trial, C.I.B. was eleven years old. Her attorney ad litem visited her several times and reported to the trial court in July and September 2017. In each report, the ad litem stated that C.I.B. wanted to live with her grandmother, and the ad litem recommended that C.I.B. remain in her current placement. While C.I.B. was with P.E., her attendance in school was good and she achieved high marks, including the A honor roll in fourth grade.

In the Department's November 16, 2017 report to the trial court, it noted that:

- Father was arrested on March 12, 2017, for terroristic threat, resisting arrest, search, or transport. The victims included Mother;

- Father had two positive urinalyses for alcohol;

- Mother had a negative drug test; and that

- Both were requested to drug test on November 28, 2017 for urinalysis and hair follicle but failed to do so.

In December 2017, the Department filed a motion for protective order for a psychological evaluation which the trial court granted. The sealed psychological evaluation was not trial exhibit and not made part of the record on appeal.

## D.  Trial

On March 28, 2018, the Department filed a report with the trial court ahead of that day's trial in which the Department detailed Mother and Father's progress with services:

5

- Mother was charged with failing to maintain financial responsibility, issued a citation and released, but her vehicle was impounded on February 21, 2018;

- Mother took an oral swab drug test on February 28, 2018, which was negative;

- Mother and Father were requested to drug test March 21, 2018, but could not go that date. The case worker provided alternate dates the following week for urinalysis and hair follicle, but they did not test.

Trial was held that afternoon. The Department presented its caseworker, Evonne Flores. Mother and P.E. also testified. Father was not present; according to Mother, Father was at home sick.

### 1.    Flores's Testimony

Flores testified that Mother and Father had not completed services, although Mother was closer to completion than Father. The Department did not seek to admit caseworker Moore's removal affidavit into evidence.

Father needed to complete eleven individual substance abuse counseling sessions and twelve group counseling sessions as well as a domestic violence program. He was enrolled in a domestic violence program but was dropped for noncompliance. He had over a year to complete the counseling but had not done so. Father had not attended visitation with C.I.B. for the past three months and before that was inconsistent. Visitation was supervised and not at P.E.'s home. According to Flores, Father was not able to provide a safe home for C.I.B., although she did not explain her reasoning for that conclusion.

Flores testified that Mother also failed to complete her service programs. Mother had been attending her substance abuse classes, but still had completed only half.

6

Mother still needed eight more individual counseling sessions and fourteen hours of group counseling. She was initially inconsistent with her attendance and was dismissed from one substance abuse program. She was in her second substance abuse program.

Mother completed the domestic violence program ten days before the trial. Yet, in December 2017, three months before trial, CCPD was called to Mother and Father's residence. According to Flores, Mother was choking Father and punched him in the face. No one was arrested.

Flores testified that she was concerned about Mother's interactions with C.I.B. during visitation. When Mother was present, she did not always interact with C.I.B.; she stepped out of the room periodically, and they do not know the reason, whether it was for water or a smoke or something else.

According to Flores, C.I.B. wanted to live with P.E. She felt safe there and feared that if she went home, her parents would fight. She remembered being scared living with them. However, C.I.B. still wanted to see her parents.

Flores testified that placing C.I.B. with Mother and Father would endanger C.I.B.'s emotional or physical safety. P.E. has been certified as a foster parent and has provided the only stable home C.I.B. has ever known, according to Flores. On cross-examination by Mother's attorney, Flores was asked about the psychiatric assessment for Mother and her diagnosis. Flores could not recall the diagnosis, but she was aware that both Mother and Father had health issues. Flores recalled that Mother had been in the hospital at some point during these proceedings and that Father has had seizures. Mother was diagnosed with bipolar disorder and it was recommended that she seek treatment, but Flores was unaware that Mother had ever done so. No exhibits were introduced through

7

Flores.

## 2. Mother's Testimony

Mother testified that she wanted C.I.B. to return home. When Mother's counsel asked her whether she had talked to a Department caseworker about services, Mother responded as follows:

> They [the caseworkers] all stated that they needed training. I told them that I was not willing to give my time; that they did not need to show up at all; that they should not be at my home; that we do not want to take part in any ultimatums. We asked them not to return. We told them we didn't want to be part of any allegation. We were promised that they would close the case and this be put behind them. We feel that this is a bum rush of our relationship. They are forcing us—they gave us an ultimatum in our marriage to separate. They violated our rights of privacy. They gave us an ultimatum to take away our child right off the bat. They violated the right to stay married. They violated my right to have [Father] stay in my town home as a roommate. They violated my rights as a mom who is teaching a minor. And, because of that, I would like to share something here that states I do not consent to foster care, adoption, or terminating parental or biological rights.

In response to the question, "What would you like Judge McCoy to do after this hearing?" Mother responded:

> To realize that I am being abused here along with my child and being separated. Our family is separated and the separation is causing a down spiral in health for all of us. It's causing us to neglect what we had originally wanted. We wanted our daughter to grow up knowing her rights, the one that I just–that I just gave. Never minding the gender, my children have to know that there is no consent with me here today for foster care, biological rights being terminated, parental rights or anything to that extent.

Mother responded to a question about health problems she and Father were experiencing when the trial court first ordered services:

> The health problems—well, moving from apartment to apartment, one. We had allergies, yeah. So, we had to, you know, open the door, close the door. I mean, it had been three or four years just trying to—just trying to make sure that people we didn't want show up at our doorsteps like Jehovah's

8

Witnesses, Mormons, and it was constant. It was constant visitation. And then, all of a sudden, CPS shows up and we ask them please. You know, we need a break, we're trying to move in, we're trying to raise our family. Please, let us be. They showed up at my father's all the way in Ben Bolt and did—they did a background search, you know. And they're forcing us to consent. And they're forcing us to take drug tests.

. . .

And, so, I fear for my life because ever since CPS has been involved, I have had policemen document things incorrectly. Policemen not wanting to document at all. Stating they don't have to document anything. EMT's not wanting to provide oxygen. Fire trucks showing up for absolutely no reason. And CPS consistently showing up. Now, I did ask last time that I would take a drug test at a cheek swab–as a cheek swab, but you know, we don't—we don't want to be abused in the courtroom pulling out hair, cutting out my hair, cutting out his hair.

. . .

Well, first of all, I can tell you that in the past, they were putting a Band-Aid over the situation and refused to leave. They kept hiring a new person to show up at my doorstep and they just kept putting the same phrases on the paper. I could tell over and over again and I understand that the Court had ruled the last session to be short to cover up more information and I fear for my life at this point. I hope you understand. The policemen are towing my cars. Not letting me get anxiety assistance. Leaving me stranded. CPS is leaving me stranded. They don't give me enough bus passes. I don't want to cooperate with this anymore. I don't give consent. I want my daughter home.

Mother denied that either she or Father had drug or alcohol problems and denied there was any family violence. She testified that Father worked for Labor Max, his job required him to be available to work six days a week, and that he had seizures that interfered with his ability to function. Mother testified it would be in C.I.B.'s best interest to be returned to her and Father.

On cross-examination by the Department's attorney, Mother defended her relationship with Father:

9

Q. Ma'am, how long have you and [Father] been together?

A. I think I object to that since I feel that I'm being bombarded to end my relationship through CPS's involvement.

THE COURT: Okay. You have to answer the question, okay.

A. Can you repeat the question?

Q. (By Ms. Delgado) How long have you and [Father] been together?

A. 13 years and, thanks to CPS, I can say that you all's group therapy can definitely shorten a marriage quicker than the blink of an eye.

Q. Okay. How would you describe your relationship with [Father]? Is it a good relationship?

A. It was a wonderful relationship, yes.

Q. Okay. Do you recall in October of 2016 when this case first got filed that you and [Father] were involved in some physical altercations? You all were fighting?

A. I also object to that statement. It was—it was someone's allegation that we were involved in domestic violence. Like I said, I'm fearing for my life with police involved. They are constantly jotting down–well, not police, but the people—when you call 911 for help and the dispatcher, they automatically put domestic violence. And I say why are you here, and they say, well, domestic violence. I said I never said that. I'll tell them. I never said that. I never gave a statement to give any of those words. And if there was—if there was an argument that was overheard, you have to remember that I am trained in martial arts, jiu jitsu, Brazilian jiu jitsu. And we do—are an open couple and we do train [C.I.B.] martial arts and pep squad and cheerleading and anything active that deserves a nice pant and healthy heart rate, we're for it. But to have an allegation to say that we are constantly in domestic violence, that is incorrect.

When asked why if she knew why Father had not completed the domestic violence classes, Mother responded:

Like I said, we were rushed at our doorstep to be forced to involve—to cooperate with CPS to train new employees and I feel we shouldn't be here. My husband is sick and tired. Physically sick and tired of telling people, no, please go away. Please leave us alone.

10

. . .

I wouldn't—I wouldn't—I wouldn't take any longer to say I want [C.I.B.] home, please. It's the best place for her. I'm her mother. You know, I've read you—I've already repeatedly read that I don't give consent to foster care, adoption, terminating parental rights, giving away biological rights at all. I want my daughter home, please.

### 3.     P.E.'s Testimony

P.E. testified that several weeks before trial, Mother called P.E. crying that her husband was abusing her and that the police were there and told her to move out if he was abusing her, but she stayed. According to P.E., the call from Mother was part of a consistent pattern between Mother and Father. P.E. testified that at the last court hearing Father "reeked of alcohol" and he consistently has a problem with alcohol which contributes to domestic violence in their house. P.E. buys toys and dinner for C.I.B. and her parents for the visitations to facilitate the relationship. C.I.B. tells P.E. that Mother sometimes just draws in the coloring book and does not interact with C.I.B. Father interacts with C.I.B. better. P.E. believes that Mother has some mental health issues that interfere with her ability to express herself and that also cause some friction between the P.E. and Mother. P.E. also acknowledged that Mother was an alcoholic who would show up at C.I.B.'s school intoxicated. Mother's alcoholism was severe enough that she was very ill with kidney and liver disease. As far as P.E. knows, Mother is not currently drinking and is taking her medication.

P.E. testified that Mother, Father, and C.I.B. all love each other, but Mother and Father's behavior are not best for C.I.B.'s well-being.

11

The Department sought appointment as permanent managing conservator with placement remaining with P.E.. P.E. joined in the recommendation, as did the ad litem. Mother and Father sought a return of C.I.B. to them. The trial court issued its final order appointing the Department permanent managing conservator of C.I.B., finding that appointment of the parents would not be in C.I.B.'s best interest because it would significantly impair the child's physical health or emotional development. The trial court also did not appoint the parents as possessory conservators:

> because the Court finds such appointment would not be in the best interest of the child and that possession or access by th[e] parent[s] would not be in the best interest of the child and that possession or access by this parent would endanger the physical or emotional welfare of the child.

It is from that order this appeal was timely perfected. Both parents were granted only limited access to C.I.B.

## II.    SUFFICIENCY OF THE EVIDENCE

By two issues, Mother and Father argue that the evidence was legally and factually insufficient to support the trial court's decision to appoint the Department as C.I.B.'s sole managing conservator and to not appoint the parents as possessory conservators.

### A.    Standard of Review

Conservatorship determinations made after a bench trial are "subject to review only for abuse of discretion and may be reversed only if the decision is arbitrary and unreasonable." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). To determine whether a trial court abused its discretion, the appellate court must decide whether the court acted without reference to any guiding rules or principles, that is, whether its decision was

12

arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.). "An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence," nor does an abuse of discretion occur so long as there is some evidence of substantive and probative character to support the trial court's decision. *In re M.M.M.*, 307 S.W.3d at 849 (citing *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding), and *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002)).

Legal and factual insufficiency challenges are not independent grounds for asserting error in custody determinations but are relevant factors in assessing whether the trial court abused its discretion. *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.). In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err in applying its discretion? *In re W.M.*, 172 S.W.3d 718, 725 (Tex. App.—Fort Worth 2005, no pet.); *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied); *see also Lee v. Melinda A.S.*, No. 02-14-00135-CV, 2015 WL 7820584, at *10 (Tex. App.—Fort Worth Dec. 3, 2015, no pet.) (mem. op.). The traditional sufficiency review comes into play with regard to the first question. *In re W.M.*, 172 S.W.3d at 725; *In re T.D.C.*, 91 S.W.3d at 872. With regard to the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision. *In re W.M.*, 172 S.W.3d at 725; *In re T.D.C.*, 91 S.W.3d at 872.

Under a legal sufficiency review, we consider only the evidence and inferences that support a factual finding in favor of the party having the burden of proof in a light most favorable to such findings and disregard all evidence and inferences to the contrary to determine whether there is any probative evidence which supports the finding. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *Corrales v. Dep't of Family & Protective Servs*, 155 S.W.3d 478, 488 (Tex. App.—El Paso 2004, no pet.). "[T]he fact finder also enjoys the right to resolve credibility issues and conflicts within the evidence. It may freely choose to believe all, part, or none of the testimony espoused by any particular witness." *In Interest of R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ) (internal citations omitted); *see In re E.S.M.*, 550 S.W.2d 749, 757 (Tex. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.) (stating that the judge was entitled to disbelieve the testimony of the biological parent).

When reviewing a claim of factually insufficient evidence, we must consider all of the evidence and determine whether the finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *See In re N.L.D.*, 412 S.W.3d 810, 818 (Tex. App.—Texarkana 2013, no pet.); *Corrales,* 155 S.W.3d at 488–89.

**B.     Applicable Law**

Sections 153.002, 153.005, and 153.131 of the Texas Family Code outline the general standards for determining conservatorship. *See* TEX. FAM. CODE ANN. §§ 153.002, 153.005, 153.131. The child's best interest is always the primary consideration. *See id.* § 153.002. When a managing conservator is appointed, it must be "a parent, a competent adult, an authorized agency, or a licensed child-placement agency." *Id.* § 153.005. The Code creates a rebuttable presumption that a parent will be named a child's managing

14

conservator, unless the court finds that such appointment would not be in the child's best interest "because the appointment would significantly impair the child's physical health or emotional development" or finds that there is a history of family violence involving the parents. *Id.* § 153.131. Impairment of the child's physical health or emotional development must be proved by a preponderance of the evidence showing "specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990); *In re J.Y.*, 528 S.W.3d 679, 687 (Tex. App.—Texarkana 2017, no pet.). Generally, such things as physical abuse, severe neglect, drug or alcohol abuse, parental instability, exposure to domestic violence, or an unstable, disorganized, chaotic lifestyle put a child at risk of emotional or physical harm. *See In re Mitchell*, 585 S.W.3d 38, 49 (Tex. App.—Texarkana 2019, no pet.); *In re J.Y.*, 528 S.W.3d at 687; *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.).

Section 263.404 of the Family Code allows the court to render a final order appointing the Department as the child's conservator without terminating parental rights if the court finds "that (1) a parent's appointment would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development, and (2) appointment of a relative of the child or another person would not be in the child's best interest." TEX. FAM. CODE ANN. § 263.404(a). In deciding whether to appoint the Department without terminating the parents' rights, the court must take the following factors into consideration:

(1) that the child will reach 18 years of age in not less than three years;

(2) that the child is 12 years of age or older and has expressed a strong

15

desire against termination or being adopted;

(3) that the child has special medical or behavioral needs that make adoption of the child unlikely; and

(4) the needs and desires of the child.

*Id.* § 263.404(b).

## C.      Permanent Managing Conservatorship

Mother and Father initially focus on the presumption in their favor embodied in the family code. *See id.* § 153.131. That presumption is rebuttable if the trial court finds either that such appointment would not be in the child's best interest "because the appointment would significantly impair the child's physical health or emotional development" or finds that there is a history of family violence involving the parents. *Id.* In this case, there is evidence that the parents each perpetrated family violence upon each other, some of which occurred when C.I.B. was present and continued after the parents were receiving services. Moreover, Father had not completed his domestic violence classes and had been dismissed from one program for noncompliance during the nearly two-year period that the parents received services. Additionally, the trial court found that appointing the parents as conservators would significantly impair the child's physical health or emotional development. As a result, the presumption is rebutted if there is sufficient evidence to support the trial court's finding. *See id.* § 153.131(b).

P.E. testified that C.I.B. did not want to return to living with her parents because she was scared of them fighting. Her testimony was supported by the attorney ad litem's reports. There was independent evidence of domestic violence in the form of neighbors' reports and police calls, as well as P.E.'s testimony that Mother consistently called to

16

report that Father abused her. Although Mother denied any episodes of domestic violence between her and Father, and denied any substance abuse by either of them, the trial court had the opportunity to hear the evidence and judge the credibility of the witnesses. *See Townsend v. Vasquez*, 569 S.W.3d 796, 808 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *Hatteberg v. Hatteberg*, 933 S.W.2d 522, 530 (Tex. App.—Houston [1st Dist.] 1994, no writ). Father admitted to his substance abuse counselor that he had used cocaine for two years and marihuana recreationally. He did not complete his substance abuse counseling, and there was evidence he continued to abuse alcohol. Father failed to take the two most recently ordered drug tests and did not appear in court for the trial. Similarly, Mother did not take the most recently ordered drug test.

The family code also provides that the trial court may appoint the Department as permanent managing conservator if appointment of a parent would "not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development" and the appointment of a relative or another person would not be in the child's best interest. TEX. FAM. CODE ANN. § 153.131(a). The trial court was also required to consider several other factors including whether she was within three years of eighteen, her mental and emotional state, her adoptability, and her needs and desires. *Id.* § 263.404(b). The trial court considered that at the time of trial, C.I.B. was not yet twelve, but over many months had expressed her strong desire to continue to live with P.E. The sole reason not to appoint the maternal grandmother as her permanent managing conservator was financial. The trial court stated that it planned to revisit the conservatorship decision regarding P.E. sometime after P.E. qualified.

17

Based upon the evidence of Mother and Father's limitations, their turbulent relationship, their inability and refusal to complete services over a seventeen-month period, Mother's failure to interact with C.I.B. fully during visitation, continued evidence of Father's alcohol abuse, and continued domestic violence incidents, the trial court did not abuse its discretion in appointing the Department as permanent managing conservator. *See In re Mitchell*, 585 S.W.3d at 49 (discussing domestic violence, alcohol abuse, and a tumultuous relationship between the parents among other reasons to find impairment of the child's emotional development). Nor did the trial court abuse its discretion by impliedly finding that the parental presumption was rebutted, and appointment of a parent as permanent managing conservator would "not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development." *See id.*

We overrule appellants' first issue.

## D.     Possessory Conservator

By their second issue, Mother and Father challenge the legal and factual sufficiency of the evidence to support the trial court's decision not to appoint them as possessory conservators in light of the family code's presumption that parents who are not appointed as managing conservators should be appointed as possessory conservators. *See* TEX. FAM CODE ANN. § 153.191. This presumption is overcome by a finding that "the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child." We have already held that the trial court did not abuse its discretion in determining that possession would endanger C.I.B.'s physical or emotional welfare. Now we must consider

whether limiting access by Mother and Father was in C.I.B.'s best interest or was an abuse of discretion.

C.I.B. requested that she not be returned to her parent's home, thus requesting that the trial court limit her parent's access to her. Father had not completed his substance abuse counseling nor his domestic abuse counseling and Mother had not completed her substance abuse counseling either. Neither parent had complied with recent requests for drug testing. Father had not seen C.I.B. in three months. Mother did not appear to have followed up for all of her mental health recommendations, although there were mental health records filed under seal available to the trial court, but not brought up on appeal. Based upon this record, we cannot say that the trial court abused its discretion in finding that "parental possession or access would endanger the physical or emotional welfare of the child" and that limiting access to C.I.B. by Mother and Father was in her best interest. *See Corrales*, 155 S.W.3d at 488–89 (stating that if after considering all the evidence, the judgment is factually sufficient if it is not against the great weight and preponderance of the evidence).

Accordingly, Appellants' second issue is overruled.

### III.    CONCLUSION

We affirm the judgment of the trial court.


GINA M. BENAVIDES,
Justice


Delivered and filed the
12th day of March, 2020.