

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

No. 08-24-00335-CV

---

In the Interest of A.M.G., a Child.[1]

---

On Appeal from the County Court at Law No. 5
El Paso County, Texas
Trial Court No. 2020DCM3885

---

## OPINION

In this modification proceeding, the divorced parents of A.M.G. sought changes to the conservatorship, possession, and access of their daughter. Appellant Maria Eugenia Gomez Garcia (Mother) challenges the trial court's denial to lift the El Paso County, Texas geographic restriction and its designation of Appellee Lorenzo Marquez Peña (Father) as primary managing conservator with the exclusive right to designate the child's primary residence. For the following reasons, we affirm.

---

[1] We use the parties' initials to protect their privacy. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Agreed Final Decree of Divorce

Mother and Father divorced on February 19, 2021. The Agreed Final Decree of Divorce named both Mother and Father as joint managing conservators of their daughter, A.M.G., with Mother as possessory conservator with the exclusive right to designate A.M.G.'s primary residence and Father as possessory conservator. The Decree also imposed a geographic restriction to El Paso County, Texas, and stated in relevant part:

> IT IS ORDERED that the primary residence of the child[] shall be within El Paso County, Texas or within[] 100 . . . miles from El Paso County, Texas, and the parties shall not remove the child[] from El Paso County, Texas for the purpose of changing the primary residence of the child[] until this geographic restriction is modified by further order of the court of continuing jurisdiction or by a written agreement that is signed by the parties and filed with [the] court.

Under the Decree, Father received a standard possession order, which granted him possession of A.M.G. on the first, third, and fifth weekends of each month; spring vacation in even-numbered years; 30 days during the summer; Father's Day; Thanksgiving in odd-numbered years; and Christmas in even-numbered years. The Decree also ordered Father to pay $913 in monthly child support.

## B. Modification proceedings

In 2022, Mother began dating her current husband, Xabier Mancisidor, who resides in Manchester, England. For over 13 years, Mancisidor has been employed as the goalkeeper coach for Manchester City Football Club (Man City), an English Premier League soccer team based in Manchester. In May 2023, Mother disclosed her new relationship to Father and the possibility that she might move to England; at that time, she had no definitive plans. A few months later in a

January 29, 2024 email, Mother advised Father she planned to relocate to England with A.M.G. in August 2024.

On February 14, 2024, Father filed a petition to modify the parent-child relationship seeking modification of possession, conservatorship, and child support. He specifically requested (1) he be designated the primary managing conservator with the exclusive right to designate A.M.G.'s primary residence, (2) he receive access and possession under the extended standard possession order, or standard possession order if Mother resides more than 100 miles from El Paso County, and (3) termination of his child support payments if the court granted his requested relief and that Mother be ordered to pay child support. On February 22, 2024, Mother filed an original answer and counter-petition to modify the parent-child relationship, requesting removal of the geographic restriction.

## C. Final Hearing

### (1) May 9, 2024 hearing

The modification hearing unfolded over two separate court sessions held in May and September of 2024.[2]

#### (a) Testimony of Mother

The trial court first heard testimony from Mother, who Father called as a witness. Mother testified that she intended to move to Manchester, England, in August 2024 because her fiancé, Mancisidor, lives and works there. She stated that she and Mancisidor had been in a long-distance relationship since 2022 and had spent a total of 112 days together in person.

---

[2] A.M.G. did not testify.

Mother testified about Mancisidor's job and explained that his contracts with Man City run for two-year terms, and his current contract was set to expire in June 2025. She described Mancisidor's schedule and travel demands and confirmed multiple times throughout her testimony that she was moving to Manchester regardless of the outcome of the modification proceedings. She also testified that as of January 2024, she had voluntarily quit her job, where she earned $115,000 annually. She explained she planned to secure a family visa after marrying Mancisidor and remain voluntarily unemployed in Manchester, claiming that Mancisidor would support her and A.M.G. Mother further testified that A.M.G. and Mancisidor had a "pretty good" relationship and that A.M.G. had spent a total of 27 days total with Mancisidor in person. Photos of A.M.G. with Mother and Mancisidor were admitted.

Mother also described A.M.G.'s life in El Paso. A.M.G. had participated in several activities including karate, school ballet, soccer, and tennis. Mother testified that Father takes A.M.G. to horseback riding lessons. She described Father as a "good father" who has "been present" but described their difficulties co-parenting. According to Mother, Father had not exercised his standard possession time, missed many events in A.M.G.'s life, and never exercised his full 30 days of possession in the summer. However, she also testified that she and Father set their own schedule together "every month." She further testified that Father began to be more involved with A.M.G. after she informed him of her plan to move to Manchester.

Mother testified that it is in A.M.G.'s best interest to remain with her because A.M.G. has lived with her since the separation and because of the opportunities that would be available to A.M.G. in Manchester, including exposure to different cultures and languages, private schooling, and after-school programs. Also, because Mother would not be working, she stated she could devote all her time to A.M.G.

Mother maintained throughout her testimony that she did not intend to create distance between A.M.G. and Father or interfere with their relationship. She testified that A.M.G.'s relationships with her Father, her family, and her friends would not be eliminated by the move because "communications can be maintained. This is 2024." She described A.M.G. as happy and excited about the move. However, she acknowledged that A.M.G. told Father, "Daddy Mom says that you need to sign off on some papers so I can move to Europe. Please do not sign off anything since I don't want to move. Please promise me you won't." Mother testified that Father refused to agree to remove the geographic restriction and instead proposed that A.M.G. stay with him in El Paso and travel to England during vacations and school breaks. Mother rejected that proposal. She provided Father with the scheduled breaks for the Manchester school where she intended to enroll A.M.G., as well as flight cost estimates.

### (b) Testimony of A.M.G.'s schoolteacher

A.M.G.'s schoolteacher, Priscilla Ramirez, briefly testified. Ramirez stated that Mother and Father have been equally involved in A.M.G.'s school activities. She also testified that A.M.G. "look[ed] forward" to the move.

### (2) September 9, 2024 Hearing

The final hearing resumed on September 9, 2024. The trial court heard testimony from Mother, Father, Mother's brother, and the parent of a classmate of A.M.G.

### (a) Testimony of Mother, continued

The trial court heard additional testimony from Mother. She reported that she had married Mancisidor on June 1, 2024, and that Mancisidor earns "around $1.7 million net" per year after taxes, with potential bonuses tied to team performance. Mother stated that A.M.G. would have health insurance through Mancisidor's employment and access to the team doctors. She testified

that the quality of life for A.M.G. in Manchester would exceed that in El Paso and that Mancisidor is "paying right for everything." She further testified that A.M.G. would benefit from Mancisidor's income, including living in his multi-million-dollar home.

Mother's family in El Paso consists of her brother and his two children. Mother stated that A.M.G.'s relationship with her side of the family would not be affected because her brother was willing to visit them in Manchester. She testified that based on her school breaks, A.M.G. would have 126 vacation days and that A.M.G. could visit Father (or vice versa) four times per year. She also proposed that Father visit A.M.G. during the school year.

Mother further testified that A.M.G.'s education in El Paso has been dual language, with most instruction in Spanish. In Manchester, however, instruction would be entirely in English, and Mother admitted that A.M.G. had never been exposed to full-immersion English instruction.

Mother was also questioned about the "vulgar" and "derogatory" language she uses with Father, which she acknowledged using when she feels he is not participating. She testified about an incident that became physical after a drop-off, and although she initially denied assaulting Father, she later admitted she injured him but claimed it was an accident. Mother was also questioned about instances of including A.M.G. in messages with Father during their disputes.

### (b) Testimony of Father

Father testified that he shares a very close bond with A.M.G. Photos of him and A.M.G., and photos of A.M.G. with Father's side of the family, were admitted. Father stated that he has attended many medical appointments, school events, and extracurricular events, which is evidenced in the admitted photographs. Also admitted was a calendar of his possession time with A.M.G. Father testified that he exercised 119 days of possession in 2021, 161 days in 2022, and 180 days in 2023. These counts included handoff days when A.M.G. stayed overnight with Father

6

and he was responsible for dressing her, feeding her, and taking her to school in the morning. Father explained his involvement in A.M.G.'s extracurricular activities, including tennis, swimming, gymnastics, and summer camps at the YWCA, and produced receipts for the activities he paid for. At the time of the hearing, Father had accepted a new work-from-home job earning $85,000 annually.

Father shared his concerns about A.M.G. being removed from her environment, city, family, friends, and him. He explained that A.M.G. sees his side of the family monthly and described the close relationship A.M.G. has with her paternal grandparents—her only living grandparents. A.M.G. enjoys the painting classes her grandmother gives her, and her grandfather teaches her how to use tools.

Father confirmed that Mother rejected his proposal to have A.M.G. stay in El Paso with him and visit her in Manchester during school breaks. He described his co-parenting with Mother as "difficult from her end" and testified that she often insults him when she "doesn't get her way." He also recounted specific instances where Mother threatened him and included A.M.G. in those messages. He further testified about the incident in which Mother physically assaulted him after a drop-off. According to Father, A.M.G. had been in therapy since.

### (c) Testimony of A.M.G.'s maternal uncle

The trial court next heard testimony from Mother's brother, Roberto Antonio Gomez Garcia. He testified that he supported his sister's decision to move to Manchester and planned to visit her and A.M.G. there.

### (d) Testimony of classmate's parent

Alma Luna is the mother of a very good friend of A.M.G. Luna testified that she noticed Father 's increased involvement beginning in February 2024, when Mother decided to move to

7

Manchester. Based on her observations, before this, Mother—and not Father—had been the one involved in A.M.G.'s school activities.

### D. Final order

On September 12, 2024, the trial court issued its "Order and Findings on Motion to Modify" in Father's favor and signed its findings of fact and conclusions of law on October 9, 2024. On November 15, 2024, the trial court signed its final order. It found material and substantial changes in circumstances, maintained the El Paso County geographic restriction, and designated Father as the managing primary conservator with Mother as possessory conservator. The trial court also terminated Father's child support obligation and ordered Mother to pay $225 per month. The trial court made the following findings, in relevant part:

- "[Mother] testified that she resigned from her $115,000 salary job in April 2024 in anticipation of her move out of the country."

- "[Mother] testified that she was moving to Manchester, England regardless of the ruling in the pending modification cases."

- "[Mother] testified that her move out of the USA was to be a permanent move."

- "[T]estimony from both parents set forth that both parents take an active role in the health, education and welfare of their child."

- "[T]estimony from both parents indicate challenges co-parenting A.M.G."

- "[T]estimony set forth that A.M.G. has extended family relationships and support from both sides of her family in and around El Paso, Texas."

- "[T]estimony set forth that A.M.G. has a strong social circle (friends) in El Paso, Texas."

- "[T]estimony set forth that A.M.G.'s primary education has occurred primarily in Spanish . . . in El Paso, Texas."

- "[T]estimony established that [Father] has exercised more time than what the Standard Possession Order - Extended has afforded him."

- "[The] Court finds that material and substantial changes are found to exist since the rendition of the divorce decree in 2021."

- "[The] Court finds that A.M.G.'s residence is to be restricted to El Paso County, Texas."

- "[The] Court finds that [Father] is designated as the primary caretaker of A.M.G."

- "[The] Court finds that [Mother] is to be designated as the possessory conservator for purposes of access to A.M.G."

- "[The] Court finds that [Mother] is granted possession of and access to A.M.G at reasonable times agreed [upon] by the parties and failing agreement, the Standard Possession Order-Non Extended for parents residing over 100 miles from the residence of the child."

This appeal followed.[3]

## II. STANDARD OF REVIEW

A trial court's order modifying a joint managing conservatorship will not be disturbed on appeal absent a clear abuse of discretion. *Long v. Long*, 144 S.W.3d 64, 67 (Tex. App.—El Paso 2004, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). "The test for abuse of discretion is whether the trial court acted in an arbitrary and unreasonable manner, or whether it acted without reference to any guiding principles." *Id.* (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985)). In making this determination, we must view the evidence in the light most favorable to the actions of the trial court and indulge every legal presumption in favor of the judgment. *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex. App.— Houston [1st Dist.] 1993, writ denied). "The judgment must be affirmed if it can be upheld on any legal theory  the evidence." *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam). If there is some evidence of a substantive and probative character to support the decision, the trial court did not abuse its discretion. *Holley*, 864 S.W.2d at 706.

---

[3] Mother does not challenge her child support obligation.

In applying this standard to a modification suit, where the abuse-of-discretion and sufficiency-of-the-evidence standards of review overlap, we employ a hybrid appellate review, asking: (1) whether the trial court had sufficient information upon which to exercise its discretion; and (2) whether the trial court erred in its application of discretion. *Long*, 144 S.W.3d at 67–68; *Clark v. Binder*, No. 03-22-00631-CV, 2024 WL 2868277, at *3 (Tex. App.—Austin June 7, 2024, no pet.) (mem. op.). Such sufficiency challenges in family law cases are not independent grounds for review but are "are considered as factors relevant to whether the trial court abused its discretion[.]" *Int. of A.C.M.*, 593 S.W.3d 894, 897–98 (Tex. App.—El Paso 2019, no pet.).

"Whether there is legally sufficient evidence is determined by viewing the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* (cleaned up). A legal sufficiency challenge will be sustained if the record shows:

> (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact.

*Int. of E.S.S.*, 658 S.W.3d 613, 616 (Tex. App.—El Paso 2022, no pet.) (citations omitted). Evidence is more than a scintilla if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Clark*, 2024 WL 2868277, at *3.

In reviewing the factual sufficiency of the evidence, "we consider and weigh all evidence, and will set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust." *Int. of A.C.M.*, 593 S.W.3d at 898. We must presume that the factfinder resolved all inconsistencies in favor of the order if a reasonable person could do. *Id.* As such, we cannot substitute our conclusions for those of the trial court if there is sufficient,

10

competent evidence of probative force to support the trial court's findings. *Long*, 144 S.W.3d at 67.

## III. DISCUSSION

In four issues, Mother challenges the trial court's order. In Issue One, Mother asserts the evidence is legally and factually insufficient to support the trial court's finding that the proposed move will negatively impact A.M.G. and Father's ability to maintain a continuous and meaningful relationship. In Issue Two, Mother challenges the denial of her request to lift the geographic restriction. In Issue Three, Mother asserts the evidence is legally and factually insufficient to support the trial court's finding that designating Father as managing primary conservator with her retaining visitation rights as possessory conservator is in A.M.G.'s best interest. In Issue Four, Mother challenges the trial court's deviation from the standard possession order.

### A. Modification of geographic restriction

In Issues One and Two, Mother challenges the trial court's decision to maintain the El Paso County geographic restriction. In her first issue, Mother specifically challenges the trial court's finding that the move will negatively impact A.M.G. and Father's ability to maintain a continuous and meaningful relationship. In her second issue, Mother challenges the sufficiency of the evidence to support maintaining the geographic restriction. Because these issues overlap, we analyze them together.

#### (1) Applicable law

A party may move to modify an existing order. *In re V.L.K.*, 24 S.W.3d 338, 342 (Tex. 2000). Section 156.101 of the Texas Family Code governs the modification of custody determinations. *Id.* Under § 156.101, a movant seeking modification of the terms and conditions of conservatorship must show that (1) the modification would be in the best interest of the child;

11

and (2) the circumstances of the child, a conservator, or other person affected by the order have materially and substantially changed since the date of the rendition of the prior order. Tex. Fam. Code. Ann. § 156.101(a). This appeal concerns only the first element—whether the modification is in the child's best interest.[4]

As the Texas Supreme Court has noted, whether it is in the child's best interest to modify a geographic restriction is generally guided by the public policy considerations set forth in § 153.001 of the Texas Family Code, which include: "(1) assur[ing] that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child; (2) provid[ing] a safe, stable, and nonviolent environment for the child; and (3) encourag[ing] parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage." Tex. Fam. Code. Ann. § 153.001(a); *Int. of A.C.M.*, 593 S.W.3d 894, 898 (Tex. App.—El Paso 2019, no pet.).

In *Lenz*, the Texas Supreme Court evaluated the standards for relocation and identified several factors that courts should consider when determining whether lifting a geographic restriction is in the child's best interest. *Lenz v. Lenz*, 79 S.W.3d 10, 15–18 (Tex. 2002). Those factors include:

> (1) the parent's good-faith reasons for the proposed move; (2) the effect the move would have on the economic, educational, health, and leisure opportunities for the custodial parent and the child; (3) the positive impact the move would have on the custodial parent's emotional and mental state, with beneficial results to the child; (4) whether the move would improve the custodial parent's financial situation and ability to provide a better standard of living for the child; (5) whether the child's special needs or talents could be accommodated at the new location; (6) the child's relationship with and presence of extended family and friends, and the effect the

---

[4] Neither party disputes that a material and substantial change has occurred affecting the circumstances of the child, a conservator, or other person affected by the order. *See, e.g.*, *Fuentes v. Jasso*, No. 08-03-00109-CV, 2004 WL 1078498, at *3 (Tex. App.—El Paso May 13, 2004, no pet.) (mem. op.) (holding parents' remarriage, coupled with father having left El Paso County—who had the exclusive right to establish the child's residence in El Paso County—constituted a substantial and material change warranting modification).

12

move would have on those relationships; (7) the effect the move would have on the noncustodial parent's visitation and communication with the child, and his ability to maintain a full and continuous relationship with the child; (8) whether the noncustodial parent has the ability to relocate; and (9) whether a visitation schedule could be arranged that would allow the noncustodial parent to continue a meaningful relationship with the child following the move.[5]

*Int. of M.V.*, 583 S.W.3d 354, 360 (Tex. App.—El Paso 2019, no pet.).

### (2) The trial court did not abuse its discretion in maintaining the El Paso County, Texas geographic restriction.

We begin by applying the *Lenz* factors to determine whether the trial court abused its discretion in maintaining the geographic restriction.

### (a) Good-faith reason for move (*Lenz* Factor #1), positive emotional and mental impact (*Lenz* Factor #3) and financial impact and standard of living (*Lenz* Factor #4)

We address Mother's good-faith reason for the proposed move (*Lenz* Factor #1), the positive emotional and mental impact the move would have on Mother and the beneficial results to A.M.G. (*Lenz* Factor #3), and the financial improvement for Mother and ability to provide a better standard of living for A.M.G. (*Lenz* Factor #4). *Id.* at 15–18.

Because the trial court found that "there is a good-faith reason for the proposed move," Mother challenges *Lenz* Factors #3 and #4. Mother maintains the trial court "failed to recognize and apply the considerations established by *Lenz* in regard to the custodial parent's happiness considerations and how the same will affect the child." According to Mother, the trial court did not consider "that the denial of the removal of the geographic restriction will have a detrimental impact on [her], which in turn will have an adverse effect on [A.M.G.]." In support, Mother relies on her testimony that A.M.G. has expressed that she misses her when Father exercises long periods

---

[5] Mother concedes that "[t]here was no evidence presented on this case by either party as to any special needs or a specific talent." Therefore, we do not address *Lenz* Factor #5.

13

of possession and argues that this evidences a stronger bond between her and A.M.G. compared to the one A.M.G. has with Father.

Mother also challenges *Lenz* Factor #4, arguing that the trial court failed to analyze whether the move would provide her and A.M.G. an economic enhancement. She relies on her testimony that although she previously made $115,000, she was only left with "around $10,000 per year if anything" after taxes and expenses. Mother also points to her testimony that because Mancisidor will cover all of her expenses, including her home in El Paso, she will gain $33,600 a year in rental income, will live in a home in Manchester worth around $1.7 million, and she and A.M.G. will benefit from Mancisidor's yearly salary of $1.7 million.

Although we recognize the impact the move would have on Mother's emotional and mental state and the enhancement to her financial situation, which A.M.G. would benefit from, these considerations do not control the ultimate decision and must be evaluated in light of A.M.G.'s best interest. *See In re C.P.L.*, No. 07-11-00128-CV, 2011 WL 6217426, at *3–4 (Tex. App.—Amarillo Dec. 14, 2011, no pet.) (mem. op.) ("The best interest of the child is the court's primary consideration in determining issues of conservatorship and possession of and access to the child[,]" and "[w]hile the trial court could consider the potential of improved financial circumstances, this did not control its decision.").

Father maintains the trial court was free to "weigh the quality of any benefits Mother would receive against the risks associated with her actions." For example, the trial court found that "[a]t trial, [Mother] testified that she resigned from her $115,000 salary job in April 2024 in anticipation of her move out of the country." Father maintains that Mother "chose to become voluntarily unemployed and become financially dependent on her new husband while moving to a foreign country where she has no apparent contacts or connections other than with him." Mother confirmed

14

she planned to be unemployed in Manchester, be 100% financially dependent on Mancisidor, and does not have the ability to get her El Paso job back or work in England without a work visa.

Mother testified that Mancisidor's employment contracts with Manchester City are for two-year terms and are either renegotiated or reconsidered at the expiration of each term. At the time of the final hearing, Mancisidor's contract was under negotiation for another two-year term. We agree that the trial court could infer the lack of permanency associated with the nature of Mancisidor's two-year contract terms and the risks of Mother's complete financial reliance on him. Mother also testified to Mancisidor's travel and schedule, explaining that there are two games per week from August to May, and half of those games are away games, which would require Mancisidor to travel, in addition to different tournaments that would require further travel. Father maintains that the "trial court could infer that the high-pressure nature of Mancisidor's work and his frequent travel schedule during tournament season would result in Mancisidor's frequent absence from the marital home during the school year," which paints a picture of isolation for Mother and A.M.G. in Manchester. We conclude these factors are neutral.

### (b) Effect of move on opportunities for Mother and child (*Lenz* Factor #2)

We next address the effect the move would have on the economic, educational, health, and leisure opportunities for Mother and A.M.G. *Lenz*, 79 S.W.3d at 15–18. Overall, Mother testified that she believes she and A.M.G. will have a better quality of life in Manchester.

Beginning with education, Mother testified that A.M.G. would attend a private school in Manchester, as opposed to her public school in El Paso, and that the Manchester school has students from all over the world and offers classes in French, German, and Japanese. Father counters that this advantage is undercut because A.M.G. already receives trilingual instruction in English, Spanish, and French at her school in El Paso. A.M.G.'s instruction in El Paso was also

predominantly in Spanish and would become 60% Spanish, 30% English, and 10% French in the incoming school year. By contrast, Mother testified the proposed school in Manchester would instruct 100% in English, which Mother confirmed A.M.G. had never been exposed to. Father testified that A.M.G.'s lack of exposure to English is a concern and argues that switching A.M.G. to an "English-only curriculum in Manchester could constitute a shock to her system and present an educational challenge."

As to health, Mother testified she and A.M.G. would have private health insurance through Mancisidor's job and access to the team's doctors "24-7." Father argues the record does not indicate that A.M.G. has any unique medical needs that can only be addressed in Manchester, and not El Paso. He further maintains that the "only evidence in the record establishe[d] that both Mother and Father took A.M.G. to routine medical, dental, and optical visits. The trial court could infer A.M.G.'s routine healthcare needs were being adequately met in El Paso; nothing in the record suggests to the contrary." We agree.

We next consider leisure opportunities for Mother and A.M.G. Mother argues that the "only evidence in the record is that the move will afford . . . leisure opportunities for the child," but she identified only that she located a karate school in Manchester. By contrast, the record reflects extensive extracurricular participation in El Paso, including swimming, gymnastics, karate, tennis, soccer, horseback riding, ballet, and YWCA summer camps.

We also consider the cultural opportunities that A.M.G. would experience in Manchester, including, as Father highlights, the "potential for travel to other parts of Europe, and lifestyle increase that A.M.G. would experience as the stepdaughter of a professional soccer coach in England." However, Mother admitted that A.M.G. would still experience these travel and cultural opportunities if she remained in El Paso and visited her.

16

In sum, though the record reflects prospective advantages in Manchester, it appears most are already available in El Paso, and Mother conceded that the cultural and travel opportunities tied to Manchester would remain available to A.M.G. if she were to remain with Father and visit her. We conclude this factor is neutral.

### (c) Effects on child's relationships (*Lenz* Factor #6)

*Lenz* Factor #6 considers A.M.G.'s relationships with extended family and friends and the effect the move would have on those relationships. *Id.* at 15–18.

On Mother's side, she testified only about her brother and his children. Mother shared that A.M.G. socializes with her brother and his two children, and with the children of her friends. Mother's brother testified that he has a meaningful relationship with A.M.G. and plans to visit her in Manchester and FaceTime with her.

On Father's side, Father described a "[r]eally close bond" between A.M.G. and her only living grandparents, who live in El Paso. A.M.G.'s paternal grandmother gives her painting lessons, and A.M.G. also enjoys learning about tools from her paternal grandfather, whom she sees monthly. Photos of A.M.G. with Father and her paternal grandparents were admitted. Father also testified that A.M.G. enjoys her relationships with her paternal uncle, aunt, and cousins, who she also sees monthly. As to friends, Father testified that A.M.G. has several close friendships. He named five of A.M.G.'s friends and testified that she has known one since she was born and two since about age two.

Father emphasizes that Mother did not testify whether she had any family, friends, or social support in England aside from her husband, or whether A.M.G. knew anyone in England. He also maintains that the trial court could have found that lifting the geographic restriction could have "alienated A.M.G. from her entire support system, degraded the quality of A.M.G.'s relationships

17

with her friends and extended family, and placed her in a new environment in a foreign county where the only social network A.M.G. has is her mother and her mother's new husband."

The record shows a deep and longstanding familial and social support system in El Paso, while Mother offered no evidence of any comparable network in Manchester apart from her husband. We find this factor supports the trial court's finding that maintaining the El Paso County geographic restriction is in A.M.G.'s best interest.

> **(d) Effect on Father's visitation and communication and his ability to maintain a full and continuous relationship with child (*Lenz* Factor #7), ability of Father to relocate (*Lenz* Factor #8), and feasibility of alternative visitation arrangement that would enable Father to continue a meaningful relationship with child (*Lenz* Factor #9)**

*Lenz* Factor #7 considers the effect the move would have on Father's visitation and communication with A.M.G., and his ability to maintain a full and continuous relationship with her. *Id. Lenz* Factor #8 considers whether Father has the ability to relocate, and *Lenz* Factor # 9 evaluates whether a visitation schedule could be arranged that would allow Father to continue a meaningful relationship with A.M.G. *Id*.

Mother raises factual and legal sufficiency challenges to the trial court's findings on these factors. She specifically challenges the court's findings that the proposed move would 1) "impact the child and [Father] negatively in their ability to maintain a continuous and meaningful relationship with each other"; and 2) "cause undue disruption to the child and to her relationship with [Father]."

Mother argues that the trial court failed to employ "a more fluid balancing test" as required by *Lenz* and "ignore[d] the fact that any relocation case will inevitably cause some degree of disruption to the child." Father responds that "there was legally and factually sufficient evidence

18

tending to show that Father would suffer more hardship by [A.M.G.] going to England than Mother would suffer traveling to El Paso, which weighs in Father's favor."

As discussed above, Mother testified she would be unemployed in England and rely on Mancisidor. She also testified that because Mancisidor would cover all of her expenses, she would gain about $2,800 per month in rent from her El Paso home and $500 per month from another property. In addition to not working and living off of Mancisidor's salary, she would generate $3,300 per month in rental income. Mother confirmed her financial situation would improve by explaining, "[f]or me it's going to be better." Although Father testified that he had accepted a new job with an $85,000 annual salary, the record contains evidence of the significant travel costs he would bear and the strain he believed it would place on his relationship with A.M.G. Mother testified that flights to Manchester booked in advance costs between $700 and $800, and flights booked three to four months out cost up to $1,300 to $1,400. She submitted evidence of a roundtrip flight for $1,435.40. Mother conceded that if A.M.G. visited Father four times a year, as she proposed, that would cost Father about $5,600, which according to Father, "constitutes more than half of the approximately $10,164.00 a year Father pays Mother in child support."

Mother testified she would give Father a dollar-for-dollar credit against child support to offset airfare, but the financial burden is not the only consideration. Visitation and communication are at the forefront. Mother testified that "nowadays, communication can be maintained. This is 2024," and believes that electronic means of communication via Zoom or FaceTime are ways to connect with individuals. She testified that A.M.G. already has a cell phone and that if relocation were granted, she would add devices to enable FaceTime or video chats. When asked whether Zoom or FaceTime are of equal value to personal contact, Mother conceded: "I don't believe it's the same thing[.]"

19

As for Mother's proposed visitation schedule, she testified that based on school breaks, A.M.G. could visit Father four times per year. Father testified this would not provide sufficient contact with A.M.G. He maintains that Mother's proposal would result in "having less days of access than he currently has now, which would negatively impact his relationship with A.M.G.[,]" and that although Mother would "let Father visit during the school year," she "does not point to anything in the record suggesting that it would be logistically or financially feasible for Father to travel to Manchester during the school year to visit while working a full-time job."

We agree that the record supports the conclusion that lifting the El Paso geographic restriction would significantly disrupt Father's relationship with A.M.G. We are also mindful that the record shows that relocation would impose a substantial financial and logistical burden on Father. We find legally and sufficient evidence exists to support the trial court's decision that A.M.G.'s relocation would affect Father's ability to maintain a full, continuous, and meaningful relationship with A.M.G. The trial court therefore did not abuse its discretion in finding that maintaining the El Paso County geographic restriction is in A.M.G.'s best interest. *See Int. of K-A.B.M.*, 551 S.W.3d at 287 ("There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship."). Issue One is overruled.

On this record, and after reviewing the *Lenz* factors,[6] we conclude there is evidence of a substantive and probative character to support the trial court's decision to maintain the geographic

---

[6] Mother challenges the legal and factual sufficiency of the trial court's finding that "maintaining the existing geographic restriction is in the best interest of the child as she has good education, good connection to her community, good connection to her extended family, good opportunities and good extracurricular activities." Mother contends the "*Lenz* factors analyze whether the move will accommodate for the child special needs or talents, and what opportunities the move will afford the child with respect to health, education, and leisure as opposed to whether the child has good education, good opportunities and good extracurricular activities in the current place of residence[,]" and the trial court therefore "failed to analyze the correct law on relocation cases." We disagree. Our review of the record as a whole and our analysis of the *Lenz* factors led us to conclude that legally and factually sufficient evidence supports the trial court's decision that maintaining the El Paso County geographic restriction was in A.M.G.'s best interest. And as we have previously stated, a "trial court's determination of what is in the best interest of the child 'will

restriction. Moreover, it is not our purview to make credibility determinations, as the "trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Long*, 144 S.W.3d at 67. Issue Two is overruled.

## B. Modification of conservatorship designation and possession

In Issues Three and Four, Mother challenges the trial court's designation of Father as managing primary conservator while she retains visitation rights as possessory conservator.

### (1) Applicable law

A court can modify the terms of conservatorship, possession, or access if the movant shows that (1) there has been a material and substantial change warranting the modification since the date of the last order establishing conservatorship, possession, or access; and (2) the modification would be in the best interest of the child. Tex. Fam. Code Ann. § 156.101(a)(1); *Lenz*, 79 S.W.3d at 14. Because neither party disputes the existence of a material and substantial change, our review is limited to whether designating Father as managing primary conservator was in A.M.G.'s best interest. *See id.* A managing conservator has the right to establish the child's residence and has primary custody of the child, while a possessory conservator has visitation rights under terms and conditions set by the court. *See* Tex. Fam. Code Ann. §§ 153.132, 153.192; *see also In re V.L.K.*, 24 S.W.3d 338, 340 (Tex. 2000).

---

be reversed *only when it appears from the record as a whole* that the court has abused its discretion.'" *Int. of A.C.M.*, 593 S.W.3d 894, 897 (Tex. App.—El Paso 2019, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)) (emphasis added); *see also Townsend v. Vasquez*, 569 S.W.3d 796, 808 (Tex. App.—Houston [1st Dist.] 2018, pet. denied.) (providing modification order "will be disturbed only when it is clear that the court acted in an arbitrary or unreasonable manner, without reference to any guiding principles."). We do not find that to be the case here.

In determining whether the evidence is sufficient to affirm the trial court's finding that the designation of Father as managing primary conservator is in A.M.G.'s best interest, we employ the *Holley* factors. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Those factors include:

> (a) the desires of the child; (b) the emotional and physical needs of the child now and in the future; (c) the emotional and physical danger to the child now and in the future; (d) the parental abilities of the individuals seeking custody; (e) the programs available to assist these individuals to promote the best interest of the child; (f) the plans for the child by these individuals . . . ; (g) the stability of the home . . . ; (h) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (i) any excuse for the acts or omissions of the parent.

*Id.*; *see Townsend v. Vasquez*, 569 S.W.3d 796, 808 (Tex. App.—Houston [1st Dist.] 2018, pet. denied.) (employing *Holley* factors in determining whether trial court abused its discretion in modifying order to designate one parent over another as conservator with exclusive right to designate the primary residence of the child); *see also Epps v. Deboise*, 537 S.W.3d 238, 244 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (same). These factors are not exhaustive, and a court may consider other factors. *In re K-A.B.M.*, 551 S.W.3d at 287–88. In a bench trial, the trial court, as the trier of fact, is the sole judge of witness credibility and the weight to afford their testimony and may choose to believe or disbelieve testimony. *Townsend*, 569 S.W.3d at 807–08.

**(2)   Legally and factually sufficient evidence supports the trial court's designation of Father as managing primary conservator.**

We review the record under the *Holley* factors[7] to determine whether legally and factually sufficient evidence supports the trial court's ruling.

---

[7] We do not address *Holley* Factor #5 (available programs to assist the promotion of the child's best interest), as neither party presented evidence or arguments on this factor.

### (a) Child's desires (*Holley* Factor #1)

We begin with the child's desires. A.M.G. did not testify and was nine years old at the time of the final hearing. When a child is too young or unable to express her desires, the factfinder may infer those desires from the evidence. *In re K.M.*, No 07-16-00120-CV, 2016 WL 3660076, at *4 (Tex. App.—Amarillo, June 29, 2016, pet. denied) (mem. op.).

Mother testified that A.M.G. was "happy" and "excited" to move to Manchester, and A.M.G.'s schoolteacher also testified that A.M.G. "look[ed] forward" to the move. Contrary evidence was also before the trial court. In a February 2024 email Father sent Mother, he relayed that A.M.G. had expressed her desire not to move: "Daddy, Mom says that you need to sign off on some papers so I can move to Europe. Please do not sign off anything since I don't want to move. Please promise me you won't." The email was admitted without objection.[8] Mother confirmed Father notified her of what A.M.G. said and did not refute it.

Faced with conflicting evidence, the trial court, as the factfinder, could credit A.M.G.'s plea and infer a desire not to move. *See Int. of M.V.*, 583 S.W.3d 354, 365 (Tex. App.—El Paso 2019, no pet.) ("Because the trial court is in the best position to observe the witnesses and their demeanor, we give the court great latitude when determining the best interest of a child."). We conclude this factor is neutral.

### (b) Current and future emotional and physical needs (*Holley* Factor #2) and current and future emotional and physical danger (*Holley* Factor #3)

We next consider the second and third *Holley* factors together. The second factor is the child's emotional and physical needs now and in the future and the third is the child's emotional and physical danger now and in the future. *Holley*, 544 S.W.2d at 371–72. The need for

---

[8] The email was admitted as Plaintiff's Exhibit H (P-H).

permanence is a paramount consideration. *Int. of R.A.G.*, 545 S.W.3d 645, 653 (Tex. App.—El Paso 2017, no pet.).

The trial court heard extensive testimony about the parties' co-parenting challenges. Both admitted text messages evidencing those difficulties, including name calling on both sides. Father described co-parenting with Mother as "[d]ifficult from her end," explaining that she often becomes "vulgar with insults" when she "doesn't get her way." He testified he believes Mother tries to "alienate[]" him from A.M.G. when she is upset and pointed to messages in which Mother stated: "You better pay for that summer event. If you don't, I'll make the modification to the child support and -- and I'll fuck you up with everything, asshole." Mother admitted she is vulgar with Father but testified he also speaks to her that way at times; messages showing Father's name calling were admitted.

The trial court found that "testimony from both parents set forth that they struggle communicating effectively and respectfully with each other when discussing issues related to A.M.G. and [Mother] includes the child in electronic communications involving conflicts with [Father]." The referenced communications are group text messages between Mother and Father during disputes in which Mother included A.M.G. Father explained that Mother used derogatory terms and threatened him in those text messages. Mother was questioned about her "offensive" and "threatening" language, including: "take me to court if you don't like it" and threats about calling the police. Mother attempted to justify including A.M.G. in these messages, stating: "And, again, every time that I have a conflict with him -- it's because he's not participating. So he can say that [it's] for that reason that he's not participating. Because the conflict starts because of his lacking [of] participation." Mother admitted including A.M.G. in disputes with Father but claimed it was a mistake:

24

Q:      Now, you include [A.M.G.] in a lot of your communication with [Father] in a text group with the three of you, correct?

Mother: That is not often. But maybe on some cases we have a conversation between the three of us.

Q:      Okay. And you are very derogatory to [Father] in those communications that involve your daughter, correct?

Mother: I'm aware only of one -- in a specific situation. But it was a mistake that [A.M.G.] was on that conversation.

Although Mother admitted this happened once, Father identified three different instances—in June, August, and November of 2021. Those messages were admitted. Mother admitted that after the November 2021 incident, A.M.G. "was very afraid that day." Father testified that Mother's inclusion of A.M.G. in communications is concerning because A.M.G. becomes "noticeably sad" and "shuts down," and he has apologized to A.M.G. on Mother's behalf. He also testified that this volatility between the parties led to A.M.G. starting therapy.

The trial court also heard testimony of a physical altercation in May 2021. Mother testified Father contacted her during his period of possession to drop off A.M.G., but she had other commitments. When he arrived, they argued outside of the house in front of A.M.G. Father testified: "she was arguing a lot with me at a point that I wanted to leave because she was getting violent. So . . . I tried to leave. [] I opened the door of my car, tried to get in, and . . . while I was getting into my car, she . . . pushed the door of my car and -- and pressed my -- my arm with the door." Mother acknowledged injuring Father but claimed it was an accident.

This evidence shows persistent, high-conflict exchanges in A.M.G.'s presence and that Mother, on multiple occasions, included A.M.G. in the parties' messages. The trial court could reasonably infer that distance could worsen those exchanges and lead to further emotional disturbance to A.M.G, particularly given the evidence that such communications caused

observable distress to A.M.G. and led her to begin therapy. Moreover, the testimony of a physical altercation and Mother's admission of injuring Father further supports a risk of emotional harm to A.M.G. On this record, the trial court could reasonably infer that A.M.G.'s relocation would likely exacerbate the conflictual dynamic, pose continuing emotional harm to A.M.G., and undermine permanence and stability. We conclude these factors weigh heavily in support of the trial court's best interest finding.

### (c) Parental abilities (*Holley* Factor #4), acts and omissions (*Holley* Factor #8), and excuses for the parent (Holley Factor #9)

We examine the fourth, eighth, and ninth factors together. The fourth factor pertains to the parenting abilities of those seeking custody. *Holley*, 544 S.W.2d at 371–72. The eighth factor considers the parent's acts or omissions, while the ninth factor evaluates excuses for the parent's acts or omissions. *Id*.

Father contends the evidence established he is a "good and loving father" and that photographs admitted at the hearing "showed that [he] engaged in many activities with A.M.G., paid for A.M.G.'s extracurriculars as part of a cost-split with Mother, attended parent-teacher conferences, and provided for A.M.G.'s needs during [his] periods of possession." Although Mother testified that Father became more involved after she disclosed her intent to relocate, she also testified that Father was a "good father" and that he has "been present." The trial court found:

- "At trial, testimony from both parents set forth that both parents take an active role in the health, education and welfare of their child."

- "At trial, testimony established that [Father] exercised more time than what the Standard Possession Order – Extended has afforded him."

Regarding acts and omissions or excuses for the parent, Mother testified that Father did not exercise his possession "to the letter," while Father maintains that his "inability to exercise certain

custody periods was due to working night[] shifts and because of COVID disruptions at work in 2021[.]" Mother also confirmed that Father switched jobs in February 2023, which eliminated his work challenges tied to exercising possession. Father explained that he and Mother "had worked together to informally accommodate each other's schedules, and that [Mother] did not object to this arrangement until she decided to move to England with Mancisidor[.]" Mother agreed and testified that she and Father "define[d]" their own schedule together "every month" and stated the reason Father had not followed the actual standard possession schedule is "because of trips that either he or that I have -- we reach an agreement every month and we define . . . the visitation schedule." Photographs admitted at the hearing show Father's involvement at A.M.G's school events, family events, holidays, vacations, medical appointments, and extracurricular activities. We conclude these factors support the trial court's best interest finding.

### (d) Plans for child (*Holley* Factor #6) and stability of home or proposed placement (*Holley* Factor #7)

We next consider the sixth and seventh factors. The sixth factor examines the plans for the child by those seeking custody, and the seventh factor examines the stability of the home or proposed placement. *Id.* at 371–72.

Father maintains that his "plan involved maintaining the status quo with A.M.G. in El Paso, ensuring that she would still receive a quality education, participate in extracurricular activities like tennis and horseback riding, and see her very close friends and extended family members." Photographs admitted show a close bond between Father and A.M.G., and depict A.M.G. engaging in various activities with Father, her paternal relatives, and her friends.

As previously discussed, Mother testified she selected a private school in Manchester offering multilingual classes and after-school programs, and that the relocation would provide

what she described as a "better quality of life" for A.M.G. based on the $1.7 million dollar home they would live in and exposure to travel and cultural opportunities. She also testified she planned to be unemployed, which would enable her to devote "100% of [her] time" to A.M.G. As noted in the *Lenz* analysis, however, the trial court heard testimony regarding concerns about abruptly switching A.M.G. to an English-only curriculum she had never been exposed to, as well as testimony about the close bond she shares with her El Paso support system, including her only living grandparents. The record also reflects concerns regarding the lack of permanency tied to Mancisidor's two-year contract terms and Mother's total financial dependence on him while living in a foreign country.

Father further argues that "the trial court could have considered the nature of Mother's relationship with her new husband in assessing whether a placement in England would have been a stable one." Mother acknowledged that although she has been in a long-term relationship with Mancisidor since 2022, she had spent around "112" days with him in person and that A.M.G. had only spent a total of 27 days with him. Father also identifies other concerning conduct such as Mother "suddenly quitting her $115,000 a year job to move 5,000 miles away to a foreign country, threatening to move her daughter to a foreign country without obtain[ing] prior court approval despite knowing court approval was required, and foregoing her own financial independence to become voluntarily unemployed and financially dependent on a man who she knew largely from video calls." Mother's own testimony regarding her priorities and plans was also before the trial court. For example:

> Q:      Your number one priority is to marry this man and to move to Manchester it appears; is that correct?
>
> Mother:  That's correct.
>
> Q:      Your number one priority is not the best interest of your daughter.

28

Mother: My first priority is what's best for my daughter.

Q: How can you have two priorities, ma'am, two number one priorities?

Mother: They are not two priorities. I know that being with my partner I can provide a better future for my daughter, because my daughter is my priority.

Mother also testified she was moving to Manchester regardless of the outcome of the hearing. She testified:

Q: Now, you have represented in your discovery responses that you are going to Manchester City, you personally, whether this Judge grants your daughter to go or not; that you are going; is that correct?

Mother: That is correct.

Q: Can you tell me about how you came to that conclusion . . . not knowing that your daughter can go or not, you are adamant that you are going. Correct?

Mother: That is correct.

Q: Tell me how you reached that conclusion . . . That you are going no matter what. Regardless of your daughter your decision is you're going?

Mother: Correct.

Q: Tell me how you came to that conclusion.

Mother: Well, I already quit my job. We already have plans over there. So my life is going to be over there.

. . .

Q: Your life plan is over there, whether that includes your daughter or not. Your life is over there, that's what you're telling this Court; is that correct?

Mother: That is correct.

Q: Okay. How did you reach that conclusion given you have a nine-year-old child? That she is not part of -- your decision is you're going regardless. How did you come to that decision knowing your nine-year-old daughter may or may not be able to go?

Mother: We've made all the plans to live over there. My daughter has already been over there. She has been happy. She knows about the schools she could go to.

Mother confirmed twice more that she was moving to Manchester no matter what.

This evidence permitted the trial court to infer that Father's plan preserved a known, stable environment for A.M.G., while Mother's plan depended on future contingencies and a relocation she intended to pursue regardless of whether A.M.G. could accompany her. After considering the entire record and reviewing the *Holley* factors, we conclude that the trial court's finding that designating Father as managing primary conservator is in A.M.G.'s best interest was supported by legally and factually sufficient evidence. *See Townsend*, 569 S.W.3d at 807–14 (affirming modification granting father the right to designate residence based on evidence showing mother's alienation efforts and father's preferable home and support, despite mother having been child's primary caregiver his whole life). Issue Three is overruled.

### (3) The trial court did not abuse its discretion by deviating from the Standard Possession Order.

In Issue Four, Mother contends that the trial court abused its discretion "by deviating from the standard possession order in violation of the best interest of the child's presumption under section 153.252 of the Texas Family Code." Mother argues the trial court deviated by granting her possession and access only when residing more than 100 miles from A.M.G.

Where both parents are appointed as the child's managing conservators, as here, the trial court allocates their respective rights and duties. *Int. of N.P.M.*, 509 S.W.3d 560, 564 (Tex. App.—El Paso 2016, no pet.) (citing Tex. Fam. Code Ann. § 153.071). "While the guidelines in the standard possession order are intended to guide courts as to the minimum possession for a joint managing conservator, there is a rebuttable presumption that the standard possession order provides the reasonable minimum possession of a child for a parent named as a joint managing conservator and that the order is in the child's best interest." *Id*. (citing Tex. Fam. Code Ann. §§ 153.251(a), 153.252(1), (2)). However, courts may deviate from the standard possession order

if sufficient evidence rebuts this presumption. *Id.* (citing Tex. Fam. Code Ann. §§ 153.256). "Issues regarding access to children require the trial court to consider first and foremost the best interest of the child." *Escalante v. Escalante*, 632 S.W.3d 573, 581 (Tex. App.—El Paso, no pet.) (citing Tex. Fam. Code Ann. § 153.002.). In making this determination, courts employ the *Holley* factors, and "the trial court is given wide latitude in determining the best interest of the child and will be reversed only for an abuse of discretion." *Int. of N.P.M.*, 509 S.W.3d at 564.

According to Mother, the trial court "completely omitted section[s] 153.312 and 153.3171 of the Texas Family Code and granted no access and possession to [her] when she resided less than 100 miles" from the child's primary residence. These statutes are inapplicable here. Section 153.312, titled "Parents Who Reside *100 Miles or Less Apart*" applies to "possessory conservators [who] reside[] *100 miles or less* from the primary residence of the child[.]" Tex. Fam. Code Ann. § 153.312 (emphasis added). Similarly, § 153.3171, titled, "Beginning and Ending Possession Times for Parents Who Reside *50 Miles or Less Apart*," applies to a "possessory conservator [who] resides *not more than 50 miles* from the primary residence of the child." Tex. Fam. Code Ann. § 153.3171 (emphasis added). We take judicial notice that Manchester is well over 100 miles away from El Paso County, and the trial court found that "[Mother] testified that her move out of the USA was to be a permanent move."

Mother contends that "[t]he only evidence on the record is that of a plan and intent to move, however, there is no evidence on the record that the move had actually occurred," and that the trial court "ignores the possibilities that after the court's ruling [Mother] decides not to move after all, or that if she does move, her relationship with her husband doesn't work and she decides to move back to El Paso." We reject this argument. Our review is limited to what was presented in the trial proceedings; we do not consider new evidence or post-judgment circumstances, and as discussed

31

above, Mother testified repeatedly and unequivocally that she was moving to Manchester no matter what.

Father also argues that Mother "herself sought deviation from the standard custody order; she cannot now complain on appeal that the trial court deviated from the custody order." *See In re Estate of De Chavez*, No. 08-23-00072-CV, 2024 WL 3090531, at *6 (Tex. App.—El Paso June 21, 2024, pet. denied) (mem. op.) ("The doctrine of invited error provides that a party may not complain of an error which he has invited."). When asked about the provision governing a possessory parent who lives over 100 miles from the child and the election to exercise the first, third, and fifth weekends of every month, Mother stated she would not want that arrangement for A.M.G. Mother explained:

> I don't think that it's right for a nine-year-old child to travel that distance for -- so often to come to El Paso. So that is why -- the best thing for her would be for her to come for long periods of time when she has her breaks at school. I also do not believe that [Father] would like to see her daughter fatigued because of that[.]

When asked whether she would be satisfied with seeing A.M.G. four times per year, Mother responded in the affirmative. These concessions by Mother support the trial court's decision to deviate.

As we have previously stated, "[a] reviewing court's holding that a trial court did not abuse its discretion implies that the evidence contained in the record rebutted the presumption that the standard possession order was reasonable and in the child's best interest." *Int. of N.P.M.*, 509 S.W.3d at 564. As such, we find sufficient evidence supports the trial court's determination of custody and possession, and the trial court did not abuse its discretion by deviating from the standard possession order regarding Mother's possession of A.M.G. *See id.*; *see also Gray v. Gray*, 971 S.W.2d 212, 216 n.2 (Tex. App.—Beaumont 1998, no pet.) (citing *Interest of Doe*, 917

S.W.2d 139 (Tex. App.—Amarillo 1996, writ denied) ("Needless to say, our holding of no abuse of discretion by the trial court naturally implies that the evidence contained in the record before us rebutted the presumption that the standard possession order was reasonable and was in the child's best interest."). Issue Four is overruled.

## IV. CONCLUSION

We appreciate the difficulties of sharing children and the strain that co-parenting can place on families. There are, all too often, no perfect solutions. However, as we have explained before, "our job, is not to second-guess the trial court's decision, or express how we might have ruled differently . . . instead our job is to ensure that the trial court did not act unreasonably, arbitrarily, or without reference to guiding principles of family law in reaching its decision." *Int. of M.V.*, 583 S.W.3d at 365.

After reviewing the record and considering and balancing the relevant factors, we conclude the trial court did not act unreasonably or arbitrarily in determining that it was in A.M.G.'s best interest to maintain the El Paso County, Texas geographic restriction, and in designating Father as managing conservator with Mother retaining visitation rights as the trial court's determination was supported by both legally and factually sufficient evidence. The trial court's order is affirmed.

MARIA SALAS MENDOZA, Chief Justice

November 14, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

33